[No. B175827. Second Dist., Div. Five. Aug. 30, 2005.]

BRILL MEDIA COMPANY, LLC, et al., Plaintiffs and Appellants, v.
TCW GROUP, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV. Justice Mosk's dissenting opinion is to be published.

## COUNSEL

Blecher & Collins, Maxwell M. Blecher, James Robert Noblin; Hennefer & Wood and James A. Hennefer for Plaintiffs and Appellants.

Sidley Austin Brown & Wood, James M. Harris, Thomas P. Hanrahan, Joel G. Samuels and Amy P. Lally for Defendants and Respondents AIG Retirement Services, Inc., and Shannon Ward.

Quinn Emanuel Urquhart Oliver & Hedges, John B. Quinn, John K. Hart, and Marc R. Rosner, for Defendants and Respondents TCW Group, Inc., et al.

## OPINION

## TURNER, P. J.—

### I. INTRODUCTION

Plaintiffs, 74 media related companies operated by Alan Brill,[1] appeal from an order granting a Code of Civil Procedure section 425.16 special motion to strike brought by 16 defendants.[2] Effective January 1, 2004, Code of Civil

---

[1] Plaintiffs allege the following are plaintiffs: Brill Media Company, LLC; Brill Media Management, Inc.; BMC Holdings, LLC; BMC Holdings, Inc.; Central Michigan Newspapers, Inc.; St. Johns Newspapers, Inc.; NMG Holdings, LLC; NMG, LLC; CMR II Holdings, LLC; CMR II, LLC; Huron Holdings, LLC; Huron Newspapers, LLC; Huron P.S., LLC; Upper Michigan Holdings, LLC; Upper Michigan Newspapers, LLC; Advertisers P.S., LLC; Central Printing Service, LLC; Grand Traverse Newspapers, LLC; GR I Holdings, LLC; GR I, LLC; Northland Holdings, LLC; Northland Broadcasting, LLC; NB II, Inc.; NB III Holdings, LLC; NB III, LLC; Northern Colorado Holdings, LLC; NCR II, Inc.; NCH II, LLC; NCR III, LLC; Northern Colorado Radio, Inc.; NCR IV Holdings, LLC; NCR IV, LLC; Tri-State Broadcasting, Inc.; TBR I Holdings, LLC; TBR I, LLC; TSB IV, LLC; Brill Radio, Inc.; Reading Radio, Inc.; PRH I, Inc.; PRH, LLC; TBR IV Holdings Management, Inc.; TBR I Management, Inc.; TSB IV Management, Inc.; IRH I, Inc.; IRH, LLC; Northern Colorado Holdings Management, Inc.; NCR IV Holdings Management, Inc.; NCR IV Management, Inc.; CRH I, Inc.; CRH, LLC; Northland Holdings Management, Inc.; Northland Broadcasting Management, Inc.; NB III Holdings Management, Inc.; NB III Management, Inc.; MRH I, Inc.; MMRH, LLC; CMB II, Inc.; Central Missouri Broadcasting, Inc.; Huron Holdings Management, Inc.; Huron Newspapers Management, Inc.; Huron P.S. Management, Inc.; Upper Michigan Holdings Management, Inc.; Upper Michigan Newspapers Management, Inc.; Advertisers P.S. Management, Inc.; Central Printing Service Management, Inc.; Grand Traverse Newspapers Management, Inc.; GR I Holdings Management, Inc.; GR I Management, Inc.; MNH I, Inc.; MNH, LLC; NMG Holdings Management, Inc.; NMG Management, Inc.; CMR II Holdings Management, Inc.; and CMR II Management, Inc.

[2] The defendants are: TCW Group, Inc.; AIG SunAmerica, Inc.; Shared Opportunity Fund IIB, LLC; TCW Shared Opportunity Fund III, LP; TCW Leveraged Income Trust, LP; TCW Leveraged Income Trust II, LP; TCW LINC III CBO, Ltd.; TCW Leveraged Income Trust IV,

Procedure section 425.17 was enacted which created two exceptions to Code of Civil Procedure section 425.16, the special motion to strike statute. This case involves alleged efforts by some bondholders and their related entities to take control of the issuer's assets as well as those of others. In the published portion of this opinion, we examine the second exception to the special motion to strike remedy, which is found in Code of Civil Procedure section 425.17, subdivision (c). We conclude that Code of Civil Procedure section 425.17, subdivision (c) prevents the use of the special motion to strike procedure in this case. All of plaintiffs' claims arise from speech or conduct described in Code of Civil Procedure section 425.17, subdivision (c). Therefore, we reverse the order granting the Code of Civil Procedure section 426.16 special motion to strike.

## II. THE BASIS OF DEFENDANTS' ATTACKS ON THE AMENDED COMPLAINT

### A. Introduction

Defendants' Code of Civil Procedure section 425.16 special motion to strike was based on the original complaint, the amended complaint, and bankruptcy court records. Plaintiffs relied on the two complaints and three declarations. Defendants presented no counter declarations.

The upshot of defendants' theory is that plaintiffs' claims all arise from the filing of an involuntary bankruptcy petition. Defendants assert therefore pursuant to Code of Civil Procedure section 425.16, subdivision (b)(1) that the burden shifted to plaintiffs to demonstrate the allegations of the amended complaint had the "requisite minimal merit" to allow the lawsuit to proceed. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741 [3 Cal.Rptr.3d 636, 74 P.3d 737]; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 94 [124 Cal.Rptr.2d 530, 52 P.3d 703].) As will be noted, we ultimately conclude defendants have failed to sustain their burden of proving plaintiffs' causes of action are outside the scope of Code of Civil Procedure section 425.17, subdivision (c). As a result, the burden of proof never shifted to plaintiffs. But in the initial portion of this opinion, we discuss what documents a trial court may rely on in determining whether one of the exceptions in Code of Civil Procedure section 425.17 is present.

---

LP; TCW (SHOP III), LP; TCW Advisers (Bermuda), Ltd.; TCW (LINC II), LP; TCW (LINC IV), LLC; TCW Asset Management Company; TCW Investment Management Company; Nicholas W. Tell, Jr.; and Shannon Ward.

### B. Code of Civil Procedure Sections 425.16 and 425.17
### Burdens

When a special motion to strike is filed, the initial burden rests with the defendant to demonstrate that the challenged cause of action arises from protected activity. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802]; *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 194 [10 Cal.Rptr.3d 154].) As a practical as well as legal matter, the defendant's initial burden is in part to demonstrate that the challenged cause of action is subject to the special motion to strike procedure. The Courts of Appeal have held: "[I]t is the defendant's burden in an anti-SLAPP motion to initially show the suit is within the class of suits subject to a motion to strike under section 425.16. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 304 [106 Cal.Rptr.2d 906].)" (*Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 685 [10 Cal.Rptr.3d 702] [holding that cause of action is subject to Code Civ. Proc., § 425.17 exception to special motion to strike procedure]; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 186 [6 Cal.Rptr.3d 494] [defendant did not meet its initial burden in ephedrine liability litigation].) In determining whether a defendant sustained its initial burden of proof, the court relies on the pleadings and declarations or affidavits. Code of Civil Procedure section 425.16, subdivision (b) states: "(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the *pleadings, and supporting and opposing affidavits* stating the facts upon which the liability or defense is based." (Italics added.)

The second prong of the special motion to strike procedure looks to what will occur at trial by reference to admissible evidence. Our colleague, Associate Justice Robert Mallano of Division One of this appellate district, has explained this well established aspect of special motion to strike jurisprudence thusly: " ' " 'An assessment of the probability of prevailing on the claim looks to trial, and the evidence that will be presented at that time. . . . Such evidence must be admissible.' " ' (*Schoendorf* [*v. U.D. Registry, Inc.* (2002)] 97 Cal.App.4th [227,] 236 [118 Cal.Rptr.2d 313], quoting *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 654, 656 [49 Cal.Rptr.2d 620], overruled on another point in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685].)" (*Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 710 [27 Cal.Rptr.3d 318]; compare *Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 67 [in making both the first and second prong determinations, a court looks to the pleadings *and* affidavits].) In this case, we

are not assessing the possible merits of plaintiffs' causes of action—this is not a second prong case. But in determining whether the challenged cause of action arises from protected conduct, the first prong, the court necessarily looks to the allegations in the operative complaint. This does not preclude a court from examining affidavits in making the first prong assessment; in fact the Legislature explicitly permits a court in making the first prong assessment to rely on affidavits. (Code Civ. Proc., § 425.16, subd. (b)(2) ["In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."].) But a court must look to the operative pleadings in making the first prong assessment.

Plaintiffs contend that their amended complaint is not subject to the special motion to strike procedure because of Code of Civil Procedure section 425.17, subdivision (c). The controlling statutory language relied upon by plaintiffs is as follows: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling . . . goods or services, including, but not limited to . . . securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The . . . statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." (Code Civ. Proc., § 425.17, subd. (c).) The adoption of Code of Civil Procedure section 425.17 exempts certain causes of action from the special motion to strike procedure. (*Brenton v. Metabolife Internat., Inc.*, *supra*, 116 Cal.App.4th at pp. 685, 689–690.)

What is procedurally unclear is how a court rules on the application of the Code of Civil Procedure section 425.17, subdivision (c) exception to the special motion to strike procedure. Is this ruling made as part of the first prong of the Code of Civil Procedure section 425.16, subdivision (b) assessment where the defendant has the burden of proof? Or is the determination made as part of the second-prong merits factfinding process where the plaintiff has the burden of proof? Or is the question of the application of the Code of Civil Procedure section 425.17, subdivision (c) exception unrelated to either of the two prongs? Code of Civil Procedure section 425.17 does not directly address this issue.

■ This is a tough issue. But common sense tells us the better analysis is that the Code of Civil Procedure section 425.17, subdivision (c) finding is a first prong determination. Code of Civil Procedure section 425.17, subdivision (c) begins with the words, "Section 425.16 does not apply . . ." and then specifies an array of circumstances. As noted, some Courts of Appeal have

described the Code of Civil Procedure section 425.16, subdivision (b)(1) first prong "arising from" issue as involving a determination that the operative complaint is "within the class of suits subject" to the special motion to strike procedure. (*Brenton v. Metabolife Internat., Inc., supra,* 116 Cal.App.4th at p. 685; *Martinez v. Metabolife Internat., Inc., supra,* 113 Cal.App.4th at p. 186; *Fox Searchlight Pictures, Inc. v. Paladino, supra,* 89 Cal.App.4th at p. 304.) The Code of Civil Procedure section 425.17, subdivision (c) "does not apply" words chosen by the Legislature closely parallel the "within the class of suits subject" language utilized by the Courts of Appeal to describe the first step in the special motion to strike process. Moreover, whether the nature of a cause of action is such that the special motion to strike remedy "does not apply," to use the words in Code of Civil Procedure section 425.17, subdivision (c), is not a merits based or second prong issue. Finally, no evidence indicates there is some unspoken procedural regime that applies when a plaintiff asserts Code of Civil Procedure section 425.17, subdivision (c) applies. In the context of retroactivity discussions, Code of Civil Procedure section 425.17 has been characterized as a procedural exception to the special motion to strike remedy. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 112 [15 Cal.Rptr.3d 215]; *Brenton v. Metabolife Internat., Inc., supra,* 116 Cal.App.4th at p. 689.) Code of Civil Procedure section 425.17 did not alter the two-prong burden-shifting procedural requirements in the special motion to strike statute. We have examined the various legislative committee reports prepared in connection with the enactment of Code of Civil Procedure section 425.17. None of those reports suggests any legislative intention to alter the two-prong burden-shifting procedural requirements in Code of Civil Procedure section 425.16, subdivision (b)(1) or to impose a separate procedural format for evaluating Code of Civil Procedure section 425.17, subdivision (c) issues. (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) May 12, 2003; Assem. Com. on Judiciary, Rep. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003.) Therefore, parties may rely on both the pleadings and affidavits in litigating the application of Code of Civil Procedure section 425.17, subdivision (c). And this is done in ruling whether the defendant has sustained its burden of proving the operative complaint arises from speech or conduct that is within the provisions of Code of Civil Procedure section 425.16, subdivision (b)(1).

### C. The Amended Complaint and the Admissible Evidence

#### 1. The amended complaint

As noted, defendants presented no declarations in support of the special motion to strike. Rather, as a legal predicate for the special motion to strike,

defendants' moving papers refer only to the original and the amended complaints and documents filed in the federal bankruptcy litigation. The pleadings alleged the following occurred.

Plaintiffs are 74 related entities owned by Alan Brill which are commonly referred to as Brill Media. Brill Media, prior to January 2002, consisted of 12 radio stations and 34 newspapers in the East and Midwest with over 500 employees. Plaintiffs are either corporations or limited liability companies. Although their principal places of business are located across the country, they are all organized under the laws of the Commonwealth of Virginia.

On December 30, 1997, two plaintiffs, Brill Media Company, LLC and Brill Media Management, Inc., issued $108 million worth of bonds. In early 1998, the original bonds were exchanged for $105 million in "12% Series B Senior Notes" and $3 million in "Series B Appreciation Notes" which were due in 2007. All of plaintiffs guaranteed the aforementioned notes. In connection with the issuance of these bonds, the Brill Media entities entered into a trust indenture agreement with the United States Trust Company which set forth the duties of the trust companies, the Brill Media entities, and the bondholders. In part, the trust indenture provided: the Brill Media entities could sell any of their assets for fair value; any such sale was subject to certain restrictions; there is a 60-day waiting period after the Brill Media entities breached their obligations under the trust indenture before the bondholders could file suit; and the bondholders could not use the trust indenture to gain an advantage over others who had purchased bonds. Commencing June 15, 1998, the Brill Media entities were required to make payments to the bondholders on June 15 and December 15 of each year.

Defendants fit into two categories. The first set of defendants own the bonds issued by Brill Media Company, LLC and Brill Media Management, Inc. The second set of defendants include related companies including subsidiaries, general partners, asset advisers and managers, and other entities of the bondholders. Defendant, TCW Group, Inc., is a "large financial management company" which manages about $80 billion in assets. TCW Group, Inc. owns two subsidiaries; TCW Asset Management Company and TCW Investment Management Company. Mr. Tell is the managing partner of TCW Asset Management Company and TCW Investment Management Company. TCW Asset Management Company provided investment advice to several defendants who owned Brill Media bonds. TCW Investment Management Company provided investment advice and managed collateral for several other defendants who owned Brill Media bonds. By January 14, 2002, TCW Group, Inc. related bondholders owned $45,383,000 in Brill Media bonds, all of which were subject to the trust indenture contract.

Defendant, AIG SunAmerica, Inc., is a "large insurance, financial management conglomerate" with assets totaling $152 billion. Ms. Ward, who is a defendant, is the vice-president of AIG SunAmerica, Inc. AIG SunAmerica, Inc. purchased on behalf of certain accounts $21.7 million worth of Brill Media bonds. AIG SunAmerica, Inc. provided management services and investment services on behalf of these accounts.

The amended complaint alleged that defendants had incentives to cause the default of and liquidate the Brill Media entities. TCW Asset Management Company and TCW Investment Management Company received management, advisory, breakup, and financial consulting fees as well as additional compensation. The amended complaint alleged on information and belief that AIG SunAmerica, Inc. had similar compensation incentives. Absent a bond default or restructuring of the Brill Media assets, the TCW Group, Inc. related entities received only modest fees. By forcing a default or restructuring of the Brill Media entities, defendants would profit in various ways. The amended complaint alleged that Brill Media bonds, in 1998 through 2000 when they were in default, returned a low "internal rate of return" of only 8 percent. Absent a default or restructuring, the nominal 8 percent rate of return would not likely increase. Moreover, the Brill Media bonds provided little bonus compensation to the bondholders. If the TCW Group, Inc. parties could secure an equity stake in or force liquidation of the Brill Media entities, greater returns could be achieved.

The stated objective of the TCW Group, Inc. parties was to force a bond default. In December 1999, an officer of TCW Group, Inc., stated in response to a question about selling Brill Media bonds: "We are holders. We'd be better off if you defaulted." Further, on July 8, 2001, 51 percent of TCW Group, Inc. stock was acquired by Société Générale Group for $880 million. The structure of the sale was such that the purchase price "could increase very substantially" if the TCW Group, Inc. controlled entities could force a bond default. Between 2003 and 2006, Société Générale Group would be purchasing another 19 percent of TCW Group, Inc. The purchase price for these future staggered acquisitions by Société Générale Group was based in part on the value of the investments in Brill Media bonds. According to the amended complaint, the Brill Media bonds with an 8 percent return were a "prime candidate" for restructuring.

Based on a variety of factors, it became obvious the Brill Media entities would be unable to make the $6.3 million bond payment due December 15, 2001. Under the terms of the trust indenture, there is a 30-day grace period for making the December 15, 2001 bond payment. The Brill Media entities began efforts to restructure their bond debt. The Brill Media entities entered into two confidentiality agreements. The first confidentiality agreement was

entered into with TCW Group, Inc. and its affiliates. The second confidentiality agreement was entered into with AIG SunAmerica, Inc. and its subsidiaries. Under the terms of the two confidentiality agreements, the Brill Media entities would provide confidential information as part of the restructuring negotiations. The parties agreed that the confidential information revealed during the private negotiations would only be used in connection with a possible repurchase of Brill Media bonds. The parties further agreed that the confidential information was not to be disclosed to any outside entity or person unrelated to the possible transaction. The confidentiality agreements required the parties to not even reveal the existence of the ongoing discussion concerning possible bond restructuring. Pursuant to the confidentiality agreements, the Brill Media entities provided substantial proprietary information including: the difficulty of making the December 17, 2001 interest payment; the decision by the Brill Media entities to sell radio properties in order to secure sufficient liquidity to make the December 17, 2001 interest payment; these proposed sales would require Federal Communications Commission approval; there were several companies that may be involved in the potential sales of radio properties; and Mr. Brill would have significant tax liabilities if there was no restructuring. (The bond payment at issue was due on Monday, December 17 rather than December 15, 2001. The trust indenture agreement provides that if payment is due on a Saturday or Sunday, it need not be paid until the following Monday. December 15, 2001 was a Saturday. December 17 was the following Monday.)

In September 2001, Mr. Tell, a defendant and the managing director of TCW Asset Management Company and TCW Investment Management Company, spoke with Mr. Brill. Mr. Tell stated that he wanted to restructure the Brill Media radio entities. Mr. Tell's proposed restructuring included radio stations owned personally by Mr. Brill. Under the suggested restructuring, the TCW Group, Inc. entities would achieve control of the properties owned by Brill Media and personally by Mr. Brill. According to the amended complaint, "[Mr.] Tell stated that he had missed the buying opportunities of the early 1990's, when a lack of financial market funding drove the prices of radio properties to half their prior worth, and that [Mr.] Tell surely was not going to miss the opportunity to gain the huge profits from equity in such properties this time around." There were problems with Mr. Tell's proposed restructuring. Mr. Brill discussed these problems with Mr. Tell. Mr. Brill indicated it may be necessary to sell several of the radio stations. The amended complaint alleges, "[Mr.] Tell challenged Mr. Brill to go ahead and try to sell them." Mr. Tell "dismissed" Mr. Brill's proposals which would have insured equal treatment for all bondholders. The trust indenture required equal treatment of all bondholders including the TCW Group, Inc. affiliates.

On November 19, 2001, Mr. Tell proposed another restructuring which would not have treated all of the bondholders equally in violation of the trust

indenture agreement. The November 19, 2001 proposal would have been highly favorable to the TCW Group, Inc. affiliates. In a December 7, 2001 meeting, Mr. Brill rejected Mr. Tell's November 19, 2001 proposal. By the time of the December 7, 2001 meeting, the amended complaint alleges "defendants" had agreed among themselves to force a Brill Media bond default. According to the amended complaint, Mr. Tell once again "challenged" Mr. Brill to sell the radio properties so that there would be sufficient capital to make the December 17, 2001 bond payment. During the December 7, 2001 meeting, Mr. Tell referred to recent purchases of bonds by TCW Group, Inc. related affiliates. Mr. Tell claimed the recent bond purchases would soon allow the TCW Group, Inc. related affiliates to control the Brill Media entities debt. Mr. Tell also asserted that Mr. Brill's personal tax problems were so severe that a restructuring proposal by TCW Group, Inc. had to be accepted.

On December 7, 2001, several potential buyers were ready to purchase some of the Brill Media radio stations. If one of the potential transactions could be consummated, the Brill Media entities would be able to make the December 17, 2001 bond payment. The Brill Media entities agreed to sell four Colorado radio stations to NextMedia Group of Englewood, Colorado for $22.5 million. A Wyoming station affiliated with Mr. Brill was also to be sold as part of the transaction. The sale was to close by January 11, 2002—which would allow the $6.3 million bond payment to be made by January 16, 2002, the end of the 30-day grace period for making payments under the trust indenture. Approvals were obtained from other entities for the sale.

In December 2001 and January 2002, defendants breached the confidentiality agreements by using the propriety information for purposes not authorized by the agreements; disclosing the information to persons other than those involved in the negotiations; revealing to other parties that the confidential discussions were in fact occurring; warning other potential buyers not to enter into transactions with the Brill Media entities; threatening potential buyers with Federal Communications Commission action; telling potential buyers that there would be a bond default; claiming that Mr. Brill was in the process of selling the properties to TCW Group, Inc.; and discussing the nature of Mr. Brill's negotiations with defendants. Representatives of TCW Group, Inc. and AIG SunAmerica, Inc. contacted companies that Mr. Brill was meeting with in an effort to sell some of his radio stations in order to meet the December 17, 2001 bond payment. The potential buyers were told: Mr. Tell was going to manage any sales of the Brill Media entities; any sale would be opposed by TCW Group, Inc. and AIG SunAmerica, Inc.; any purchase of Brill Media properties should be through TCW Group, Inc. and AIG SunAmerica, Inc.; any sale of the Brill Media entities would be subject to litigation commenced by TCW Group, Inc. and AIG SunAmerica, Inc.; and

additional unrevealed facts were known by TCW Group, Inc. and AIG SunAmerica, Inc. employees which, if disclosed, would prevent any company from entering into a business relationship with the Brill Media entities. These communications violated the confidentiality agreements according to the amended complaint.

In addition to breaching the confidentiality agreements, defendants interfered with the pending sale of the Brill Media entities radio stations to NextMedia Group. Prior to January 16, 2002, Mr. Tell spoke to Sean Stover, the chief financial officer of NextMedia Group. Mr. Tell said there was going to be a bond default and he was going to handle the sale of the Brill Media assets though TCW Group, Inc. Also, Ms. Ward spoke to Steve Dinetz, the NextMedia Group president. Ms. Ward explained that if the proposed transaction with the Brill Media entities closed, the bondholders aligned with defendants would seek to unwind the transaction. Ms. Ward's conversation with Mr. Dinetz occurred while the parties were "at the closing table" in Richmond, Virginia. Several days later, in early January 2002, Ms. Ward told Mr. Dinetz that the bondholders would oppose any transaction between the Brill Media entities and NextMedia Group. During these conversations, "defendants" threatened to institute fraudulent conveyance litigation and commence administrative proceedings before the Federal Communications Commission. As a result of this conduct, on January 11, 2002, NextMedia Group declined to consummate the agreed to sale. Because the NextMedia Group transaction was not completed, the Brill Media entities failed to meet the January 16, 2002 payment deadline. On January 17, 2002, according to the amended complaint, certain bondholders began liquidation proceedings under the trust indenture. According to the original complaint, on January 17, 2002, some of the defendants commenced involuntary bankruptcy proceedings seeking to dissolve the Brill Media entities. However, defendants who were bondholders could not proceed with liquidation proceedings without first notifying the trustee and, among other things, waiting 60 days. During that 60 days after a default, the trustee is authorized by the trust indenture agreement to pursue certain remedies. Further, under the trust indenture, at least 25 percent of the bondholders must request that the trustee pursue a particular remedy. Other violations of the trust indenture agreement include: defendants were prohibited from using the trust indenture provisions to prejudice the rights of any other bondholder; the trust indenture provisions only allow the trustee or registered bondholders to take legal action; and the bondholders are prohibited from asserting preferences or priorities over one another. As a result of "defendants" unlawful actions: all of the Brill Media radio stations and newspapers were liquidated; the Brill Media entities were required to undergo debt; and the Brill Media entities incurred undesirable financial deficiencies.

Based on these allegations, plaintiffs brought 10 causes of action. The first cause of action was for contract breach. The first cause of action alleged certain bondholders, the TCW Group, Inc. affiliates and the AIG SunAmerica, Inc. subsidiaries, breached the trust indenture by refusing to allow the Brill Media entities to sell the aforementioned radio properties for $21.5 million to NextMedia Group. The "refusal" to permit the sale to occur consisted of the aforementioned: false claims by Mr. Tell that TCW Group, Inc. related parties would be handling the sale of the Brill Media entities' assets; threats by Ms. Ward to Mr. Dinetz that any sale would be subject to efforts to unwind the transaction; Ms. Ward's warning that the proposed Brill Media-NextMedia Group transaction would be opposed by the AIG SunAmerica, Inc. bondholders; threats by Mr. Tell and Ms. Ward to commence fraudulent conveyance litigation and Federal Communications Commission administrative proceedings; and other communications, the purpose of which was to prevent the contemplated January 2002 closing of the Brill Media-NextMedia Group transaction. Hence, the Brill Media entities were unable to make the $6.3 million bond payment which had to be paid under the 30-day grace period in the trust indenture by January 16, 2002. This in turn forced a liquidation of the Brill Media entities.

The second cause of action is also for contract breach; in this case the breach of the confidentiality agreements. The alleged breach of those agreements consisted of disclosure of proprietary matters subject to the confidentiality agreements to potential buyers of the Brill Media entities' properties including NextMedia Group employees. The third cause of action is for breach of the implied covenant of good faith and fair dealing. Plaintiffs were alleged to have been denied benefits of the trust indenture contract including: the right to sell their assets; the right to apply the funds from sales to debt service; the right to operate their business in its ordinary course; the right to retain equity interests in the various radio and television properties; due process rights; and the right to be free from default. Defendants were alleged to have breached the good faith and fair dealing implied covenant by: using confidential information to contact potential buyers of Brill Media properties; making statements designed to deter potential customers from buying Brill Media properties, stating a default would occur before it actually happened to potential customers of Brill Media properties; falsely claiming to others that a default would occur when liquidation was unnecessary and avoidable; claiming that defendants were authorized to sell Brill Media properties; and taking other steps to prevent the Brill Media entities from making the December 17, 2001 interest payment.

The fourth cause of action charged various defendants with interfering with the trust indenture contract with the bondholders. The fourth cause of action alleged that certain defendants used their related entities to interfere with the bondholders' contractual rights under the trust indenture. The fifth cause of

action was for intentional interference with the NextMedia Group contract. According to the amended complaint, the sale had been approved by: the lender, which had resulted in the release of certain liens; the Federal Communications Commission; and the trustee of the trust indenture agreement. The previously described conduct of Mr. Tell and Ms. Ward allegedly caused NextMedia Group to decline to enter into the proposed transaction. The sixth and seventh causes of action were for interference with prospective economic advantage in connection with the trust indenture and the NextMedia Group agreements. The allegations in the sixth and seventh causes of action closely paralleled those in the intentional interference with contractual relations claims.

The eighth cause of action was for intentional interference with economic relations with media companies other than NextMedia Group. The amended complaint alleged defendants: advised other companies not to "do business" with the Brill Media entities; warned other companies that the Brill Media entities could not perform under a contract involving the sale of the properties; falsely told other media companies there was "no way" the Brill Media entities could make the bond payments; incorrectly told other companies that the Brill Media entities would be liquidated with Mr. Brill's assistance; claimed they were going to handle the liquidation of the Brill media assets; and violated the confidentiality agreements in communicating with other potential buyers of the Brill Media assets. The foregoing conduct constituted violations of Business and Professions Code section 17200 and Virginia Code section 18.2-500, the confidentiality agreements, and trade libel.

The ninth cause of action was for negligent interference with contract and economic relations. The tenth cause of action was for violations of Virginia Code sections 18.2-499 and 18.2-500. The trust indenture has a choice of law provision requiring the application of Virginia law. The tortious conduct described in the other causes of actions was alleged to have violated Virginia Code sections 18.2-499 and 18.2-500. Based on these causes of action, plaintiffs sought: compensatory damages; treble damages pursuant to Virginia Code section 18.2-500; attorney fees; and costs of suit.

### 2. The bankruptcy pleadings

Defendants filed an extensive judicial notice request. The federal court documents indicate that on January 17, 2002, after the bond default, several defendants filed an involuntary bankruptcy petition seeking to dissolve the Brill Media entities. Later, the Brill Media entities secured bankruptcy court permission to sell their assets.

### 3. Admissible evidence presented by plaintiffs

Plaintiffs filed three declarations in opposition to the special motion to strike. The trial court conscientiously ruled on several hundred evidentiary objections to the declarations filed by plaintiffs. No abuse of discretion occurred in connection with any of the evidentiary rulings. The trial court excluded much of the declarations submitted by plaintiffs in the opposition to the special motion to strike. But the following under-oath matters were before the trial court when the special motion to strike was granted. None of the declarations were contradicted by defendants.

The identities of the parties and bond ownership was supported by the declaration of one of plaintiffs' attorneys, James A. Hennefer. Mr. Hennefer further established the depressed state of the economy in late 2001. On November 19, 2001, Mr. Brill and Mr. Tell spoke. Mr. Brill described the November 19, 2001 conversation with Mr. Tell. Mr. Brill describes the conversation thusly: "[Mr.] Tell . . . told me that he would like to do a restructuring of the Brill Media Companies to include other radio properties owned by me personally, in which restructuring TCW Group Entities would control the properties owned both by the Brill Media Companies and me personally, and in which other [b]ondholders would be squeezed out. [Mr.] Tell stated that he had missed the buying opportunities of the early 1990's, when a lack of financial markets funding drove the prices of radio properties to half their prior worth, and that [Mr.] Tell surely was not going to miss the opportunity to gain the huge profits from equity participation in such properties this time around." At the meeting, Mr. Brill was warned that his personal tax problems were "too deep" and he had to accept the proposals of the TCW Group, Inc.

According to Mr. Stover, the NextMedia Group chief financial officer, his company was attempting to purchase the Brill Media LLC Colorado and Wyoming radio stations. NextMedia Group was prepared to fund the purchase of the Brill Media LLC radio stations on Friday, January 11, 2002. According to Mr. Stover, "NextMedia was aware of the potential fraudulent conveyance issues that could arise[] out of the transaction, and it felt the purchase price represented a full and fair value and that the consideration was being allocated in a manner that fairly valued the assets to be acquired." On the afternoon of January 9, 2002, Ms. Ward, the AIG SunAmerica, Inc. vice-president, told Mr. Dinetz, the NextMedia Group chief executive officer, that the bondholders "would look seriously at unwinding" the proposed transaction. Mr. Stover explained: "At the January 9, 2002 NextMedia [b]oard meeting, the [b]oard decided not to proceed with the Brill Media acquisition.

The [b]oard came to the conclusion that it was uncomfortable with the potential threat of a fraudulent conveyance issue being raised and the potential that the bondholders would try to challenge the sale and the FCC approval process. The [b]oard decided that it wanted to do the transaction, but under the circumstances, it was not willing to proceed."

### III. THE CAUSES OF ACTION ARISE IN THE COMMERCIAL CONTEXT SPECIFIED IN CODE OF CIVIL PROCEDURE SECTION 425.17, SUBDIVISION (C)

Code of Civil Procedure section 425.17, subdivision (c) states in part: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . notwithstanding that the conduct or statement concerns an important public issue."

Defendants assert their conduct, the filing of the involuntary bankruptcy petition, is protected by the right of petition. Normally, filing a lawsuit, such as an involuntary bankruptcy petition, is conduct arising from the exercise of the right of petition. (*Zamos v. Stroud, supra,* 32 Cal.4th at pp. 964–965; *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at pp. 734–735.) But as previously noted, Code of Civil Procedure section 425.17, subdivision (c) states that the special motion to strike procedure does not apply to a cause of action brought against a person, such as plaintiffs, "arising from any statement or *conduct*" if the enumerated elements are present. (Italics added.) Filing an involuntary bankruptcy petition is "conduct" within the meaning of Code of Civil Procedure section 425.17, subdivision (c). If the other elements enumerated in Code of Civil Procedure section 425.17, subdivision (c) are present, then the filing of a lawsuit is not protected petitioning activity for purposes of Code of Civil Procedure section 425.16, subdivision (b)(1). We now turn to the other elements of Code of Civil Procedure section 425.17, subdivision (c).

First, defendants are "primarily engaged in the business of selling . . . goods or services, including, but not limited to . . . securities, or financial instruments" within the meaning of Code of Civil Procedure section 425.17, subdivision (c). Defendants are large financial management and services conglomerates involved in the purchase and sale of financial instruments and investing in companies. Plaintiffs' causes of action arise from claims brought by entities described in Code of Civil Procedure section 425.17, subdivision (c)(1).

Second, the challenged "statement or conduct was made in the course of delivering the person's goods or services" within the meaning of Code of Civil Procedure section 425.17, subdivision (c)(1). The first amended complaint alleges and the evidence to which evidentiary objections were overruled demonstrates: defendants breached the September 19 and October 4, 2001, confidentiality agreements; the purpose of the violations of the confidentiality agreements was to advance defendants' financial self interest by forcing the Brill Media entities into default and liquidation; defendants attempted to control any sale of the Brill Media entities; the chief financial officer of NextMedia Group as well as its president were threatened with litigation if the proposed purchase of the Colorado and Wyoming assets of the Brill Media entities was consummated; due to the threats of a fraudulent conveyance lawsuit and action before the Federal Communications Commission, the NextMedia Group board of directors decided not to purchase the Colorado and Wyoming properties, thereby forcing a default which was in defendants' financial interest; defendants acted so as to deny the Brill Media entities the benefits of the indenture agreement; and this conduct prevented the Brill Media entities from avoiding default and liquidation.

Further, on September 19, 2001, Mr. Tell indicated he wanted to restructure the Brill Media entities. Mr. Tell spoke directly with Mr. Brill and made several proposals for a restructuring of the Brill Media entities. Under Mr. Tell's proposal, the TCW Group, Inc. related companies would control the assets of the Brill Media entities. Mr. Tell explained that Mr. Brill's tax problems were such that the TCW Group, Inc. entities' offer had to be accepted. These statements were made and conduct engaged in as part of an effort to secure control of the Brill Media entities. Securing control of the Brill Media entities was the type of business transaction engaged in by defendants.

Third, the statements at issue made to potential buyers of the Brill Media radio stations were presented to an "intended audience [who] is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer" within the meaning of Code of Civil Procedure section 425.17, subdivision (c)(2). The

threatening statements made to the NextMedia Group president by Mr. Tell were related to a potential buyer of the Colorado and Wyoming assets of the Brill Media entities. The amended complaint alleged the intended audience consisted of potential buyers of the Brill Media entities. It is probable that misrepresentations made within the radio and newspaper industry and the broader financial community, such as the inability of the Brill Media entities to comply with their obligations under the trust indenture agreement or the competence and integrity of their management as alleged in the amended complaint, would be repeated to other potential customers.

■ Code of Civil Procedure section 425.17, subdivision (c)(2) does not require the potential purchaser be a "buyer or customer" of the defendant. There are no legislative committee reports which suggest that the potential purchaser be a "buyer or customer" of the defendant. Commercial speech directed at any "buyer or customer" including that of a plaintiff is within the scope of Code of Civil Procedure section 425.17, subdivision (c)(2). The language of Code of Civil Procedure section 425.17, subdivision (c)(2) does not require that the customer or buyer be one entering into a commercial relationship with the *defendant*.

One additional point warrants emphasis. Code of Civil Procedure section 425.17 was intended to apply to commercial disputes such as the one before us. The Senate Judiciary Committee report prepared for then Senate Bill No. 515 states, "[Senate Bill No.] 515 would make SLAPP motion[s] inapplicable to cases against a business where [the] cause of action arises from the business's commercial speech or activity." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 8, original underscoring.) This case is exactly that—plaintiffs' claims arise out of commercial speech and conduct. Our conclusion is entirely consistent with the legislative vision when it sought to restrict the availability of the special motion to strike remedy by the adoption of Code of Civil Procedure section 425.17, subdivision (c).

■ Therefore, defendants, by reference to the pleadings and the admissible evidence, failed to sustain their burden of proving that their challenged actions "aris[e] from any act . . . in furtherance of [their] right of petition or free speech under the United States or California Constitution in connection with a public issue" as that term is used in Code of Civil Procedure section 425.16, subdivision (b)(1). This is because the special motion to strike procedure in Code of Civil Procedure section 425.16, subdivision (b)(1) does not apply to defendants' alleged conduct. Why? Because Code of Civil Procedure section 425.17, subdivision (c) explicitly excludes defendants' alleged conduct from the scope of the special motion to strike procedure. For these reasons, we, with respect, disagree with the trial court's ruling to the contrary.

IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. DISPOSITION

The order granting the special motion to strike is reversed. Plaintiffs are to recover their costs incurred jointly and severally from defendants.

Armstrong, J., concurred.

**MOSK, J.,** Dissenting.—I respectfully dissent.

Code of Civil Procedure[1] section 425.16, which provides for a special motion to strike or "SLAPP" motion, governs a "cause of action . . . arising from any act of that person in furtherance of the person's right of petition or free speech . . . ." "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) The acts complained of here are rights of petition or speech specified by the statute. The requirements of section 425.17 that would exempt the action from the provisions of section 425.16 have not been met.

### 1. *The Allegations of the Complaint Arise From Acts in Furtherance of the Right of Petition.*

Each of plaintiffs' causes of action includes the general allegation that defendants breached the indenture by "mov[ing] to liquidate the Brill Media Companies' properties prior to . . . satisfying the requirements of the Indenture Contract." In addition, plaintiffs' first cause of action for breach of the indenture specifically alleges that defendants "breached the Indenture Contract by taking steps to liquidate the Brill Media Companies' properties prior to satisfying the requirements of the Indenture Contract" and by "forcing the Brill Media Companies to liquidate their assets" in violation of certain provisions of the indenture.

Plaintiffs' allege in their fourth cause of action for intentional interference with the indenture that defendants "caused the Bondholders they were

---

*See footnote, *ante*, page 324.

[1] All statutory citations are to the Code of Civil Procedure unless otherwise noted.

representing to breach the Indenture Contract" by "caus[ing] the Bondhold-holders . . . to take steps to force liquidation of the Brill Media Properties in breach of the requirements of the Indenture Contract." In their sixth cause of action for intentional interference with economic relations, plaintiffs allege that defendants intentionally interfered with plaintiffs' economic relations by proceeding with a creditors remedy "for the liquidation of Brill Media Companies without first giving the Trustee written notice of a continuing Event of Default under the Indenture Contract" and by "taking unlawful actions to force the Brill Media Companies to liquidate all of their proper-ties." All of these alleged misdeeds concern defendants' filing of a petition for involuntary bankruptcy liquidation proceedings and, as related to litiga-tion or judicial proceedings, are protected under section 425.16.

Plaintiffs refer not only to acts intended to cause bond defaults but also to acts intended to force a liquidation of plaintiffs' properties. In their original complaint, plaintiffs alleged that defendants' wrongful conduct included "filing an Involuntary Petition under Chapter 7 of the Bankruptcy Code" and other acts in "preparation of [an] Involuntary Petition for Chapter 7 bank-ruptcy proceedings." Although plaintiffs amended the complaint to allege "forced liquidation" instead of the filing of a chapter 7 bankruptcy petition, they do not contend that this change has any significance with respect to defendants' special motion to strike. Moreover, generally, a forced liquidation refers to a bankruptcy proceeding. "Chapter 7 of the Bankruptcy Code is entitled 'Liquidation' and the title fully expresses the purpose of the chapter's provisions. Chapter 7 provides the mechanism for taking control of the property of the debtor, selling it, and distributing the proceeds to creditors in accordance with the distribution scheme of the Code." (1 Collier on Bank-ruptcy (15th ed. Rev. 2005) ¶ 1.03 [2][a] at p. 1-21.) Chapter 11 of the Bankruptcy Code is a "formal recognition of the propriety of a plan to liquidate assets of the debtor in a more orderly fashion than generally occurs in a Chapter 7 liquidation." (5 Cowan, Bankruptcy Law and Practice (7th ed. 1998) § 20.1, p. 121; see *In re Made in Detroit, Inc.* (2005) 414 F.3d 576, 582 ["in bankruptcy proceedings in which the debtor is forced to liquidate . . ."].)

## 2. *The Allegations of the Complaint Arise From Acts in Furtherance of the Right of Speech.*

Section 425.16 provides protection for prelitigation statements and state-ments made in connection with an issue pending before a legislative, executive or judicial body. Subdivision (e)(1) of the statute covers "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law." Subdivision (e)(2) covers "any written or oral statement or writing made in

connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."

The California Supreme Court has held that " 'communications . . . within the protection of the litigation privilege of Civil Code section 47, subdivision (b)[2] [citation], . . . are equally entitled to the benefits of section 425.16.' [Citations.]" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [81 Cal.Rptr.2d 471, 969 P.2d 564].) "Under the 'usual formulation,' the litigation 'privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]' [Citation.] This includes prelitigation communications involving the subject matter of the ultimate litigation." (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1058 [18 Cal.Rptr.3d 882] (*Sylmar*); see *Rubin v. Green* (1993) 4 Cal.4th 1187, 1191 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) The privilege includes statements concerning litigation threatened in the event a demand is not met. (*Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 260–261 [68 Cal.Rptr.2d 305].) The privilege also encompasses statements made to third parties who have a substantial interest in the outcome of the litigation. (*Costa v. Superior Court* (1984) 157 Cal.App.3d 673, 678 [204 Cal.Rptr. 1].) Thus, "statements made in connection with or in preparation of litigation are subject to section 425.16." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908 [120 Cal.Rptr.2d 576].)

Plaintiffs' second, third, fifth, seventh, eighth, ninth and 10th causes of action are all based on statements defendants allegedly made concerning defendants' intent to institute bankruptcy proceedings, to pursue fraudulent transfer remedies, or to oppose administrative action by the Federal Communications Commission in connection with the proposed transfer of licenses. In their second and 10th causes of action, plaintiffs allege that defendants breached confidentiality agreements by "threatening the Potential Buyers [of the assets of the Brill Media Companies] with actions at the FCC if they purchased any of the Brill Media Company radio stations," and "telling the

---

² Subject to certain enumerated exceptions, Civil Code section 47, subdivision (b) states that a publication or broadcast is privileged if made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . ." Civil Code section 47 was amended, effective July 1, 2005. (Stats. 2004, ch. 182, § 4.) The amendments to subsection (b) of Civil Code section 47, which became effective on July 1, 2005, are not relevant here.

Potential Buyers, falsely, that the Brill Media Companies would be liquidated . . . ." Plaintiffs allege in their third cause of action that defendants breached implied covenants in the indenture by "making statements that the Brill media [sic] Companies would be liquidated when liquidation was not imminent or necessary." Plaintiffs in their fifth, seventh, and ninth causes of action allege that defendants intentionally or negligently interfered with a contract to sell certain assets to NextMedia by "a) a telephone call from defendant Tell to Sean Stover, Chief Financial Officer of NextMedia, in which defendant Tell advised Mr. Stover, before the January 16, 2002 expiration of the grace period for payment of the December 17, 2001 interest payment, that there was going to be a default by the Brill Media Companies, that there would be a sale of the Brill Media assets, and that he was setting up a due diligence headquarters through TCW for such sale; b) a telephone call from defendant Ward to Steve Dinetz, the President and Chief Executive Officer of NextMedia at his home in Lake Tahoe in early January 2002, in which defendant Ward advised Mr. Dinetz against closing the purchase because the Bondholders would look seriously at unwinding the transaction; and c) a telephone call from defendant Ward to Mr. Stover several days later, in early January 2002, in which defendant Ward told Mr. Stover that the Bondholders would probably oppose any deal between NextMedia and the Brill Media Companies and that the Bondholders thought that Brill media should go through a liquidation of its assets." Plaintiffs' eighth cause of action includes the allegation that defendants "falsely told the Potential Buyers that the Brill Media Companies would be liquidated with the cooperation of Alan Brill."

Each of these claims is based upon prelitigation statements protected under section 425.16, subdivision (e)(1) or (2). The statements were made concerning defendants' intent to pursue a lawsuit or other administrative action concerning plaintiffs' proposed sale of certain radio stations and plaintiffs' inability to make a pending interest payment on bonds; they were made to achieve the object of those actions—to preclude the proposed sale and to enforce rights under the bonds; and they were made to third parties with a substantial interest in the outcome of those actions. (*Sylmar, supra,* 122 Cal.App.4th at p. 1058; *Costa v. Superior Court* (1989) 157 Cal.App.3d 673, 678 [204 Cal.Rptr. 1].) The statements are therefore covered by section 425.16. (*Kashian v. Harriman, supra,* 98 Cal.App.4th at p. 908.)

### 3. *Additional Allegations Do Not Bar Application of the Statute.*

The amended complaint also contains allegations of other acts by defendants that are not covered under the special motion to strike statute—for example, that defendants breached the indenture "by refusing to allow the Brill Companies to exercise their rights under the Indenture Contract" to sell

certain of their radio stations to NextMedia and to use the proceeds from that sale to make interest payments under the loan. Nevertheless, " '[p]ublished appellate court cases have concluded that where a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 426.16 unless the protected conduct is "merely incidental" to the unprotected conduct.' (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal.Rptr.3d 215].)" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1245 [29 Cal.Rptr.3d 521]; see, e.g., *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 419 [9 Cal.Rptr.3d 242]; *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].) This issue is currently under review by the California Supreme Court. (*Kids Against Pollution v. California Dental Association,* review granted, Sept. 17, 2003, S117156.) Pending a determination of this issue by the Supreme Court, I would follow existing case law holding that "a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of 'one cause of action.' " (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308 [106 Cal.Rptr.2d 906].)

### 4. *Section 425.17 Does Not Apply.*

Section 425.17, which excludes the application of section 425.16 in certain cases, does not apply to this case. Section 425.17 provides in pertinent part: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining . . . sales or . . . was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." (§ 425.17, subd. (c).)

Section 425.17 requires that defendants' statements be representations about defendants' business or a *competitor's* business. The legislative history confirms that section 425.17, subdivision (c) was intended to apply to statements of fact made by businesses about "their goods, services or business operations, or those of a competitor." (3d reading analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.), May 6, 2003, p. 1.) The purpose of the

statute appears to have been to immunize comparative advertising by retailers from the special motion to strike statute. One legislative analysis cites the following language in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 960–961 [119 Cal.Rptr.2d 296, 45 P.3d 243], as the model for the type of speech covered by section 425.17: "In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or customers of the *speaker's goods or services*, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. [¶] Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (Assem. Com. on Judiciary, Com. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) June 27, 2003, p. 10, italics added; see Baker, *Review of Selected 2003 California Legislation Civil: Chapter 338: "Another New Law, Another Slapp in the Face of California Business"* (2004) 35 McGeorge L.Rev. 409, 422.)

Defendants allegedly made certain statements about *plaintiffs'* business. Defendants and plaintiffs are not competitors. Defendants are in the business of providing investment and financial services. Plaintiffs owned and operated radio stations and newspapers. Defendants' alleged statements were not made "in the course of delivering [their] goods or services." The alleged statements were made to NextMedia, neither a current consumer of defendants' services nor a potential future consumer of those services. And the alleged statements dealt with plaintiffs' efforts to sell capital assets—not goods or services over which plaintiffs and defendants compete.

The "intended audience" of defendants' alleged statements were not persons covered under section 425.17, subdivision (c)(2). NextMedia, the intended audience of defendants' alleged statements, was not an actual or potential "buyer or customer" of defendants' services, nor was NextMedia likely to repeat defendants' statements in order to influence any actual potential buyer or customer of those services. The "intended audience" language in section 425.17 should not be construed to apply to any potential customer of *either* plaintiffs or defendants when plaintiffs and defendants are not business competitors.

To the extent section 425.17 can be based on evidence beyond the allegations in the first amended complaint, there is no admissible evidence[3] to support the application of section 425.17 and specifically no admissible evidence to support the conclusion that defendants' statements were made "in the course of delivering [their] goods or services." Trying to take control of a company does not suggest that "goods or services" of competitors are involved for purposes of section 425.17. Neither the operative complaint nor the admissible evidence contains the conditions necessary for section 425.17 to apply.

I would affirm the judgment of the trial court.

On September 17, 2005, the opinion was modified to read as printed above. The petition of respondent AIG Retirement Services, Inc., for review by the Supreme Court was denied December 14, 2005.

---

[3] The trial court excluded all but a fraction of plaintiffs' evidence.