[No. B188995. Second Dist., Div. Five. Dec. 29, 2006.]

SUNSET MILLENNIUM ASSOCIATES, LLC, Plaintiff and Appellant, v. LHO GRAFTON HOTEL, L.P., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.1. and 2. of the majority opinion and the last two paragraphs of the concurring opinion.

COUNSEL

Pircher, Nichols & Meeks, Jeffrey N. Brown and Alan S. Petlak for Plaintiff and Appellant.

Gaines & Stacey, Fred Gaines, Lisa A. Weinberg and Noelle V. Bensussen for Defendant and Respondent.

OPINION

TURNER, P. J.—

## I.  INTRODUCTION

Plaintiff, Sunset Millennium Associates, LLC, appeals after the trial court granted a renewed Code of Civil Procedure[1] section 425.16 special motion to strike the first amended complaint filed by defendant, LHO Grafton Hotel, L.P. Plaintiff and defendant operate competing hotels in the City of West Hollywood (the city). Plaintiff sought environmental approval of an expansion of its hotel. Defendant objected to the approval of an environmental impact report. The city approved the environmental impact report. Defendant filed an unsuccessful administrative mandate petition challenging the issuance of the environmental impact report. Plaintiff then filed the present suit contending that defendant violated alleged mutual written understandings

---

[1] Unless otherwise indicated, all future statutory references are to the Code of Civil Procedure.

not to challenge any expansion of each other's hotels. Defendant filed a renewed special motion to strike, which was granted.

In the published portion of this opinion, we discuss whether the renewed special motion to strike should have been denied pursuant to section 425.17, subdivision (c). The provisions of section 425.17, subdivision (c) contain varying exceptions to the special motion to strike screening mechanism. We agree with the trial court that section 425.17, subdivision (c) is inapplicable to this case.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   The Amended Complaint

The first amended complaint was filed on July 28, 2005. Named as a codefendant in the first cause of action for contract breach was Le Songe, LLC (codefendant Le Songe), which is not a party to this appeal. On September 1, 1999, plaintiff and codefendant Le Songe entered into a written agreement, which prohibited either party from opposing any expansion of their hotels. The mutual restrictions on opposing each other's future development extended to filing "a lawsuit, administrative claim or other legal challenge" to any approvals for potential expansion of their hotels. Codefendant Le Songe was alleged on October 26, 2004, to have filed an objection to plaintiff's request for approval of an environmental impact report in violation of the September 1, 1999 agreement.

Defendant was named in the second through fourth causes of action, which were for contract breach, damages, and injunctive and declaratory relief. The second cause of action for contract breach alleged defendant purchased the hotel owned by codefendant Le Songe on January 10, 2005. Defendant thereby assumed all of the obligations of codefendant Le Songe under the September 1, 1999 agreement. According to the first amended complaint, defendant breached the September 1, 1999 agreement by: failing to publicly support plaintiff's development; filing a mandate petition challenging the approval of an environmental impact report; and filing the mandate petition for purposes of "thwarting" plaintiff's development of its property. The second cause of action sought injunctive relief restraining defendant from violating the September 1, 1999 agreement. The second cause of action also sought attorney fees pursuant to the September 1, 1999 agreement.

The third cause of action, which was based on all of the foregoing allegations, sought damages and attorney fees. The fourth cause of action sought declaratory relief and alleged: "An actual controversy has arisen and now exists between Plaintiff and defendant . . . concerning their respective

rights and duties in that Plaintiff contends that by virtue of the default by [defendant] of the Agreement described above, the Agreement may be terminated. Plaintiff is informed and believes and thereon alleges that defendant denies that the Agreement may be terminated." Plaintiff sought a declaration that the September 1, 1999 agreement was terminated.

### B. The Initial and Renewed Special Motions to Strike

#### 1. Procedural background

On August 17, 2005, defendant filed its first special motion to strike. The first special motion to strike was served on August 16 and filed on August 17, 2005, but noticed for hearing more than 30 days later on September 27, 2005. On September 27, 2005, the trial court denied the first special motion to strike. The sole ground for the denial of the special motion to strike was that the hearing was set more than 30 days after the motion was served on August 16, 2005, in violation of the provisions of former section 425.16, subdivision (f). The trial court specified that it was required to deny the special motion to strike on excessive notice grounds under the compulsion of *Fair Political Practices Com. v. American Civil Rights Coalition, Inc.* (2004) 121 Cal.App.4th 1171, 1176 [18 Cal.Rptr.3d 157] and *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1387 [129 Cal.Rptr.2d 892]. On September 28, 2005, defendant filed a renewed motion to strike based on alleged new circumstances and a change in the law. According to defendant, on October 5, 2005, Governor Arnold Schwarzenegger approved amendments to section 425.16, subdivision (f), which modified the excessive notice provisions. (Stats. 2005, ch. 535, § 1.) On November 1, 2006, the renewed special motion to strike was granted.

#### 2. The parties' factual presentations

#### a. defendant's evidence

John Fitts is the president and chief executive officer of Outrigger Lodging Services Limited Partnership and of Fitts Lodging, Inc. Fitts Lodging, Inc., is the general partner of Outrigger Lodging Services Limited Partnership. Outrigger Lodging Services Limited Partnership is the managing member of codefendant Le Songe. Codefendant Le Songe owned the Grafton Hotel in the city until approximately January 10, 2005. On September 1, 1999, Le Songe entered into a contract with plaintiff entitled, "Parking License Agreement." The September 1, 1999 agreement arose because plaintiff was pursuing environmental approval for a three-part construction project on the Sunset Strip in the city. The three parts of the project were entitled

"the East Parcel"; "the Middle Parcel"; and "the West Parcel." Under the terms of the September 1, 1999 agreement, plaintiff was granted a license to use 50 parking spaces on the property owned by codefendant Le Songe. Plaintiff was obligated to pay codefendant Le Songe $12,500 per month for the parking rights. Further, under the terms of the September 1, 1999 agreement, codefendant Le Songe was required to publicly support the proposed project and not "file any lawsuit, administrative claim or other legal challenge" against the city or plaintiff. According to Mr. Fitts, the required support extended to the then "current development" contemplated in plaintiff's 1999 conditional use permit and environmental review application. It is this part of the September 1, 1999 agreement that is subject of the original and renewed special motions to strike and this appeal.

The September 1, 1999 agreement contains a series of whereas clauses, one of which states, "WHEREAS, [plaintiff] intends to develop and construct a retail, hotel and office complex and related private parking facility on [plaintiff's] Property substantially as contemplated in its application described on Exhibit 'A' hereto and [Le Songe] intends to redevelop its existing hotel project on [Le Songe's] Property substantially as contemplated in its applications described on Exhibit 'A' hereto . . . ." The September 1, 1999 agreement states: "The foregoing support and cooperation obligations are based on the current developments contemplated in the respective [conditional use permit applications] described above. If a party's contemplated development is materially altered in a manner which materially adversely affects the other party, such other party shall not be restricted from reasonably objecting to that portion of the proposed development which has been so altered." Exhibit A lists a series of development documents including permits and agreements all of which refer to the proposed 1999 project. The parking license, as distinguished from the cooperation obligations, is to expire on September 30, 2009, subject to certain exceptions which are not applicable to this appeal. The September 1, 1999 agreement also contained clauses pertinent to: payments; parking lot use; easements; condemnation; assignments; insurance; defaults; and other routine provisions.

According to Mr. Fitts, the codefendant Le Songe actively supported the proposed 1999 project. On December 20, 1999, the city and plaintiff entered into a development agreement. According to Mr. Fitts, the "West Parcel" was developed according to the December 20, 1999 development agreement between plaintiff and the city.

In 2004, plaintiff sought environmental review for and approval by the city of a revised development plan for its parcel. According to Mr. Fitts, there were substantial differences between the approved 1999 project and components, design, and impacts of the proposed development. Mr. Fitts cited to the

introduction in the 2004 draft environmental impact report as evidence of the changed nature of the 1999 and 2004 projects: " 'Current land use entitlement of the Proposed Project Site was secured by the 1999 Sunset Millennium Development Agreement. The total development site included and entitled by the Development Agreement consists of three contiguous parcels, known as the "West Parcel," the "Middle Parcel," and the "East Parcel." Development of the West Parcel—the Plaza at Sunset Millennium—was carried out under the Development Agreement; however, entitlements have not been implemented for the Middle and East Parcels (Proposed Project Site). The Applicant has formulated a revised development plan for the Proposed Project Site . . . .' " Also, as evidence of the differing nature of the 1999 and 2004 projects, Mr. Fitts referred to another portion of the environmental impact report which describes the distinctions between the 1999 project and the proposed 2004 project: " 'The Development Agreement, approved in December 1999, allows the development of a single, 371-room, 10-story hotel building, the renovation of the 104-foot-high Petersen [Office] Building, construction of a new 10-story office building, development of restaurant and retail uses on the ground floor, and a pedestrian bridge over La Cienega Boulevard connecting the Middle Parcel hotel with the East Parcel office building. The Proposed Project revises the [1999 project] and includes the following primary changes: (a) the replacement of office uses with residential uses; (b) the demolition of the Petersen Building; (c) the relocation of the approved hotel use from the Middle Parcel to the East Parcel and the reconfiguration of the approved single, large hotel building into two smaller hotel buildings; (d) a reduction in the number of approved hotel rooms and retail floor area; (e) and an increase in the restaurant floor area, outdoor dining area, open space and parking spaces.' " (Italics omitted.) Mr. Fitts explained that any opposition by codefendant Le Songe to the project related only to the proposed 2004 development. On approximately January 10, 2005, prior to the city planning commission approval of the proposed project, defendant purchased the Grafton Hotel from codefendant Le Songe.

Lisa Weinberg, one of defendant's attorneys, stated that her firm formerly represented codefendant Le Songe. However, her firm now represented defendant. She declared that defendant had opposed the current project. Her declaration stated: "In late January, public hearings were held on the 2004 Draft EIR [environmental impact report] that had been prepared in connection with the Current Project. I provided written and oral objections to the Current Project's Draft EIR, at the City Planning Commission public hearing on January 27, 2005, noting the inadequacies of the Draft EIR regarding the Current Project's impacts on traffic, parking, noise, vibration, and air quality, and its violations of the Sunset Specific Plan and certain portions of the City's Municipal Code." Ms. Weinberg's nine-page letter to the city's

planning commission raised issues concerning: inadequate parking which would necessarily lead to congestion; the floor plan area and whether accessibility violated the Sunset Specific Plan; the adequacy of whether the statement of overriding considerations in the draft environmental impact report was "utterly inadequate"; the lack of specificity of the discussion concerning affordable housing in the draft environmental impact report; whether there was impermissible project splitting within the meaning of *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393–399 [253 Cal.Rptr. 426, 764 P.2d 278]; whether there had been no final resolution of all mitigation questions which made any approval of the draft environmental impact report premature; the misleading and inadequate discussion of construction, noise, air quality, and utility mitigation measures; the improper deferral of the resolution of sewer related issues; and the incomplete analysis of late night trips occasioned by the completed project. Despite Ms. Weinberg's objections, the city's planning commission approved the draft environmental impact report with certain conditions.

In January 2005, a final environmental impact report was prepared for plaintiff's proposed project in the middle and west parcels. The city council held hearings in April 2005. Ms. Weinberg provided written and oral objections to the final environmental impact report arguing that it violated the city's municipal code and the Sunset Specific Plan. Ms. Weinberg sent a nine-page letter to the city council reiterating most of her prior objections and asserting that the proposed final environmental report discussion was deficient in the areas of: parking; the project floor area ratio; the overriding considerations statement; affordable housing; access to the middle parcel; mitigation measures; the scale of the proposed project compared to defendant's premises; sewer capacity; and late night trips. Ms. Weinberg concluded: "The foregoing are just some of the inadequacies that remain in the project's environmental review, [mitigation monitoring program], conditions of approval and findings. The City Council simply cannot certify the [environmental impact report] and approve the proposed project under these circumstances. We ask that you take no action on the project at your meetings on April 4 and 13, 2005, and direct your staff to redraft and recirculate a revised [environmental impact report], and new Noise and Vibration Abatement Plan, taking all of the foregoing, in addition to the comments raised at the public hearings, into consideration."

Accompanying Ms. Weinberg's letter to the city council was a memorandum prepared by Donald Behrens of Behrens and Associates, Inc., an acoustics, noise, and vibration consulting firm. Mr. Behrens explained the environmental impact report was deficient in that it understated the noise and vibration impacts of the construction. Mr. Behrens stated the environmental impact report failed to discuss the specific construction methods that would

be used to limit noise and vibration levels. Because the commercial activities of a hotel, such as the one operated by defendant, require a quiet and relaxed atmosphere, it would be necessary that an environmental impact report discuss: the development of offsite noise and vibration limits; the preparation of a noise and vibration abatement plan; monitoring to insure compliance with the plan; and a plan for corrective action in the event the noise and vibration limits were exceeded. To deal with noise and vibration issues, engineering and administrative controls should be implemented according to Mr. Behrens. Finally, Mr. Behrens believed that there were practical methods that would permit defendant's guests not to be disturbed by the construction. In Mr. Behren's view, the environmental impact report failed to appropriately address these issues.

Ms. Weinberg was present at the April 13, 2005 city council meeting where the final environmental impact report and the development, demolition, and conditional use permits were approved. The city council found the project was: consistent with the public interest; complied with the city's general plan and the Sunset Specific Plan; and would not jeopardize the health and welfare of the public. On July 11, 2005, the city entered into a development agreement with plaintiff.

On May 17, 2005, Ms. Weinberg, on defendant's behalf, filed an administrative mandate petition pursuant to section 1094.5 and Public Resources Code section 21000 et seq. challenging the city's approval of the environmental impact report. The summary portion of the mandate petition alleged: "This Petition for Writ of Mandate seeks review by the Court of the actions of the City and its Council concerning the Environmental Impact Report . . . , Development Agreement, and other discretionary land use approvals for the Sunset Millennium Project (collectively, the 'Project') approved by the City, which will have significant adverse and unmitigated impacts on, among other things, land use, traffic, parking, noise, vibration, and dust in the West Hollywood community. In addition, the Project, as approved, violates the City's Sunset Specific Plan, as well as the West Hollywood Municipal Code. The actions of the City challenged herein are contrary to law and constitute an abuse of discretion." The petition alleged the city abused its discretion in approving the environmental impact report because the document violated the: California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.); municipal code; and Sunset Specific Plan. Defendant sought to have all of the aforementioned permits set aside and an environmental impact report circulated that complies with the California Environmental Quality Act. If the April 13, 2005 approval of the environmental report were to be set aside, Ms. Weinberg understood that plaintiff could still proceed with the project as approved in 1999 by the city. Approximately 16 days after defendant's mandate petition was served, plaintiff's complaint was filed in this case.

## b. plaintiff's evidence

Bennett Kim, a real estate developer who was supervising the 2004 development for plaintiff, explained: "[Plaintiff] chose to modify the development plans for the East and Middle Parcels to make them less intensive. The new project has fewer hotel rooms, less retail space, and completely trades office for residential development, which means it generates less traffic and includes more open space. Specifically, with respect to the East Parcel, the 1999 plans provided for the construction of a new seven-story office building alongside the renovated Petersen Building. The 2005 plans provide, instead, for the construction of two hotels, with a total between them of 296 rooms. With respect to the Middle Parcel, the 1999 plans provided for the development of a 371-room hotel. The 2005 plans provide, instead, for the site of a condominium complex containing 190 for-sale units."

Mr. Kim's declaration also identified a written objection to the 2004 draft environmental impact report prepared by codefendant Le Songe. The objection was in the form of an October 26, 2004 84-page letter signed by Linda J. Bonzug and Ryan M. Leaderman of the law firm Piper Rudnick addressed to the city's planning department. The letter challenged the draft environmental impact report in various respects. The October 26, 2004 letter argued: "As a general matter, in several areas critically important to [the hotel], and very likely, other nearby residents and businesses, Project impacts have not been adequately analyzed or mitigated in the [draft environmental impact report] as required by [the California Environmental Quality Act]. In fact, the negative environmental impacts will be significantly more severe than disclosed in the [draft environmental impact report] and many of the undisclosed effects are significant and unavoidable. Consequently, [the hotel] requests a recirculation of the [draft environmental impact report] pursuant to [title 14] Section 15088.5 of the California Code of Regulations . . . because significant environmental impacts will occur as a result of the Project that have not been disclosed to the public, and these impacts must be adequately analyzed, disclosed and mitigated in a recirculated [draft environmental impact report]."

The letter continued: "The [hotel's] comments relating to the [draft environmental impact report] begin with a summary of significant impacts and inadequate mitigation, and then discuss the need for recirculation. This letter will next address [the California Environmental Quality Act] inadequacies consistent with the organization of the [draft environmental impact report] beginning with the Project Description. The remaining comments will analyze the Environmental Setting, Environmental Impact Analysis, as well as Alternatives, including the following topics: Land Use and Planning; Visual

Resources; Traffic and Circulation; Parking; Air Quality; Noise; Fire Protection and Other Public Services and Utilities; Seismic Hazards; Construction; Cumulative Impacts; Alternatives; and the Mitigation Monitoring Program."

The October 26, 2004 letter proceeded to identify deficiencies in the discussion in the draft environmental impact report concerning: construction; the height of the buildings; the incorrect description of the full visual impact including shading; light and signage; inconsistent descriptions of setbacks, amenities in open space, demolition debris recycling, and a vehicular tunnel; in lieu fees for affordable housing; the public benefits resulting from valet parking; the discussion of bars; trash and loading areas; viewing decks; the necessary variances and other permits that will be needed to complete the project; the existing environmental setting; the east and south views of the project; traffic and parking; air quality; noise; the pedestrian bridge; fire protection and other public services; water; solid waste disposal; seismic risks; emergency response plan; cumulative impacts; mitigation measures; and the list of reasonably foreseeable projects. The October 26, 2004 letter also criticized the discussion of the general plan and zoning categories in the draft environmental impact report. Moreover, the October 26, 2004 letter asserted the draft environmental impact report failed to adequately discuss the inconsistencies between the proposed 2004 project and the general plan and the Sunset Specific Plan. Accompanying Ms. Bonzug's and Mr. Leaderman's letter to the city's planning department was another letter from an employee of Tishman Construction Company which discussed problems with the analysis in the draft environmental impact report: traffic; noise, dust, and hazardous materials; shoring, underpinning, and excavation; construction scheduling; safety; and the pedestrian bridge and the tunnel.

Also, plaintiff submitted the declaration of Maurice Robinson, a hotel development consultant. Mr. Robinson concluded: "I have come to the opinion that the revisions to the development program for the Sunset Millennium project would not have a material adverse effect on the operation of the [h]otel. This is not to say there might not be some short-term impacts during construction. My opinion is simply that the changes made to the 1999 development plan for the Sunset Millennium project, when taken as a whole, will not cause a material adverse impact on the [h]otel. In fact, I believe that the revised plan will be better for the [h]otel, over the long term . . . ."

Mr. Robinson described the differences between the 1999 and the 2004 plans. The 2004 plan calls for 190 residential condominiums instead of 208,000 square feet of office space as contemplated by the 1999 environmental impact report. Further, the 2004 plan calls for 296 hotel rooms to be built in two buildings instead of 371 rooms in a single structure; a reduction of 75 hotel rooms. The 2004 plan will generate 778 peak hour vehicular trips. That

is in contrast to the 1,119 projected trips in the 1999 environmental impact report. Also, the 2004 plan increases the amount of " 'excess' parking" spaces on the site relative to the level required for use of the land. Mr. Robinson declared: "The 200[4] plan provides for 1,279 spaces—a net excess of 435 over the required number of spaces. The 1999 plan provided for 1,403 spaces—an excess of only 213 over the required 1,190 spaces. . . ." Moreover, Mr. Robinson declared, "The 200[4] program reduces the space devoted to retail, restaurants, theater and outdoor space from 54,500 square feet to 44,282 square feet."

Mr. Robinson concluded that defendant's hotel would benefit from the foregoing changes, particularly due to the reductions in "competitive hotel rooms and traffic" and increases in residents and excess parking spaces. The reduction in 75 rooms in plaintiff's hotel reduced the size "of the competitive" hotel market. Defendant's hotel would benefit from reduced traffic. Building 190 condominiums less than two blocks away would increase defendant's restaurant and lounge patronage and would generate some room demand. Mr. Robinson reasoned: "The only potential long-term negative impact resulting from the changed development program would be the loss of the office space, since this space, once it was fully occupied, could have been a room demand generator for area hotels. However, I would expect this loss of potential room demand to be more than offset by the benefit to the Grafton Hotel from the reduction in development rights of 75 competitive hotel rooms at the subject property, and the business activity likely to be generated by the residents of the 190 condos." Mr. Robinson agreed there might be additional noise occurring during the demolition of the office building: "During construction, there might be additional short-term negative impacts, since the 1999 plan intended to keep the Petersen Office Building, and the 200[4] plan intends to demolish it. A new mitigation measure—a ten-foot masonry wall on the East Parcel's east border—has been added to the 200[4] plan to reduce the incremental increase in construction-related noise impacts on the adjacent [h]otel." Mr. Robinson concluded: "I do not believe that there will be any additional noise impacts on the [hotel] as a result of the 200[4] revisions. The construction work will take place during the daytime hours, when most guests are not even in the hotel. In the evening, when the guests are in, and quiet is desired, no construction-related activities are anticipated. Plus, there will be the new sound wall, so even the daytime noise levels should be lower than they might have been in the 1999 plan. I fail to see the merit in the noise argument."

## III. DISCUSSION

### A. Section 425.17

█ Plaintiff contends that defendant's special motion to strike should have been denied pursuant to section 425.17, subdivision (c). Section 425.17, subdivisions (b) and (c) enumerate circumstances where the special motion to strike screening mechanism is unavailable. (*Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 840 [36 Cal.Rptr.3d 385]; see *Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 330, 342 [33 Cal.Rptr.3d 371].) Section 425.17, subdivision (c) creates an exception to the special motion to strike screening provision for specified claims against business entities. (*Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1375, 1391 [34 Cal.Rptr.3d 368]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 7:212.10, p. 7-74; see *Brill Media Co., LLC v. TCW Group, Inc.*, *supra*, 132 Cal.App.4th at p. 342.) The portion of section 425.17, subdivision (c) relevant to plaintiff's argument states: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about . . . a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The . . . statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation . . . notwithstanding that the conduct or statement concerns an important public issue." █ In special motion to strike litigation, the initial burden of proof rests with the moving defendant to demonstrate the challenged cause of action arises from its exercise of free expression or petition rights. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 [46 Cal.Rptr.3d 638]; *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737].) We conduct de novo review of the merits of an order granting a special motion to strike. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 [39 Cal.Rptr.3d 516, 128 P.3d 713]; *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 929 [116 Cal.Rptr.2d 187].)

█ None of plaintiff's claims falls within the scope of section 425.17, subdivision (c). A special motion to strike may be denied pursuant to section 425.17, subdivision (c) only when both paragraphs (1) and (2) apply. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 7:212.10,

p. 7-74.) The complex wording of section 425.17, subdivision (c) is easier to comprehend if the word "person" is read to refer to the defendant. Thus, the initial portion of section 425.17, subdivision (c) provides that the special motion to strike screening mechanism does not apply to a "cause of action brought against a [defendant] primarily engaged in the business of selling or leasing goods or services" provided enumerated circumstances found in both paragraphs (1) and (2) are present. Defendant is subject to this language in the initial portion of section 425.17, subdivision (c)—it operates a hotel.

■ As to section 425.17, subdivision (c)(1), when the noun "defendant" is substituted for "person," it applies when the challenged "statement or conduct consists of representations of fact about [defendant's] or a business competitor's business operations . . . ." The challenged statements were all made by defendant's lawyers and they all relate to a "business competitor," which in this case is plaintiff. Defendant's lawyers made statements about the 2004 project, which involve plaintiff's business operations. Thus, the first clause of section 425.17, subdivision (c)(1) relating to statements about a "business competitor's operations, goods, or services" applies here.

■ But there are two additional alternative elements enumerated in section 425.17, subdivision (c)(1) concerning the statements or conduct about a "business competitor's business operations, goods, or services"; neither of which are present here. The first potential element requires the challenged statement about a "business competitor's operations, goods, or services" be made for the purpose of "obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, [defendant's] goods or services"; which did not occur here. (§ 425.17, subd. (c)(1).) The statements made during the administrative and litigation process were in an effort to forestall environmental approval of plaintiff's 2004 project; not for the purpose of promoting defendant's hotel "goods and services" as the phrase is used in section 425.17, subdivision (c)(1). The second potential additional element in section 425.17, subdivision (c)(1) is that the challenged "statement or conduct was made in the course of delivering the [defendant's] goods or services" which is likewise not present. As noted, all of the statements and conduct involved plaintiff's 2004 project—not defendant's hotel services. Defendant operates a hotel—it is not an environmental consulting agency or public interest group dedicated to protection of the city's ecosystem. Thus, section 425.17 subdivision (c) does not apply and the trial court correctly concluded it was obligated to resolve the merits of defendant's special motion to strike.

### B. Other contentions*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 300.

## IV.  DISPOSITION

The order granting the renewed special motion to strike is reversed. Plaintiff, Sunset Millennium Associates, is to recover its costs incurred on appeal from defendant, LHO Grafton Hotel, L.P.

Kriegler, J., concurred.

**MOSK, J.,** Concurring.—I concur.

I believe my dissent in *Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 343 [33 Cal.Rptr.3d 371], is also relevant to the determination that Code of Civil Procedure section 425.17 is not applicable.

\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante*, page 300.