Filed 7/24/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| JAMES DEMETRIADES, | B247151 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC484055) |
| v. | |
| YELP, INC., | |
| Defendant and Respondent. | |

---

APPEAL from an order of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge. Reversed.

Ervin Cohen & Jessup, Robert M. Waxman and David N. Tarlow for Plaintiff and Appellant.

Kendall Brill & Klieger, Laura W. Brill and Nicholas F. Daum for Defendant and Respondent.

_____

Plaintiff James Demetriades, who operates restaurants in Mammoth Lakes, filed a complaint seeking an injunction under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)) and False Advertising Law (Bus. & Prof. Code, § 17500 et seq. (FAL)) to prevent defendant Yelp, Inc. (Yelp), the operator of a popular online website that contains customer reviews of businesses, from making claims about the accuracy and efficacy of its "filter" of unreliable or biased customer reviews. The trial court granted Yelp's special motion to strike plaintiff's complaint under Code of Civil Procedure section 425.16,[1] finding that Yelp's statements about the filtering of reviews on a social media website were matters of public interest. The trial court further found that the public interest exemption of Code of Civil Procedure section 425.17, subdivision (b) did not apply because plaintiff asserted a personal financial stake in the case, and that the commercial speech exemption to the anti-SLAPP[2] statute set forth in Code of Civil Procedure section 425.17, subdivision (c) did not apply because Yelp's statements about the filter were not statements of fact, but were "puffery" and opinion.

We conclude that the commercial speech exemption of section 425.17, subdivision (c) applies to Yelp's statements concerning the accuracy and efficacy of its review filter, and therefore find the trial court erred in granting Yelp's special motion to strike under section 425.16. We reverse.

---

[1] All statutory references herein are to the Code of Civil Procedure unless otherwise noted.

[2] "SLAPP" suits are "'"civil lawsuits . . . aimed at preventing citizens from exercising their political rights or punishing those who have done so." [Citation.]' [Citation.]" (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 645 (*Church of Scientology*), disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.) SLAPP suits "are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests." The aim of a SLAAP suit is to "detract the defendant from his or her objective, which is adverse to the plaintiff." (*Church of Scientology*, at p. 645.)

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. Background Facts

Yelp operates a website that serves as a free social media website and search engine. Yelp is available to the public at no charge and has no registration requirement. Users who register may post reviews about local businesses, and can rate a business using a star rating of one to five stars, with five stars being the highest rating. Yelp's website draws tens of millions of people each month who search for and review the public ratings of businesses. As of September 2012, users had posted approximately 33 million reviews to Yelp's website, and according to Google analytics, Yelp had 84 million monthly unique visitors during the third quarter of 2012. Yelp sells advertising on its site to generate revenue, and in the first three quarters of 2012 Yelp generated $91 million in revenue from advertising.

Yelp constantly battles the problem of unreliable reviews, which generally are reviews written by friends, employees or relatives of the business being reviewed, paid reviews, and negative reviews written by business competitors. As a result, Yelp developed filtering software with the aim of identifying reviews likely to be unreliable. Yelp started using the filter in 2005, and has worked on improving it since then. The Yelp filter applies uniform rules to all reviews and does not favor advertisers over nonadvertisers; Yelp does not use filtered reviews in calculating a business's rating on Yelp; the filtered reviews do not appear on the main page, but are viewable on a special "filtered review page"; and business owners can freely post responses to reviews they receive on Yelp and can contact reviewers privately to engage in further dialogue. To promote the filter's integrity, Yelp businesses cannot delete, change, or reorder ratings or reviews. Yelp admits that its filter is not foolproof, and Yelp expressly tells users that "the filter sometimes affects perfectly legitimate reviews and misses some fake ones, too. After all, legitimate reviews sometimes look questionable, and questionable reviews sometimes look legitimate." Plaintiff, when purchasing advertising on Yelp, acknowledged in the advertising contract that Yelp's filtering software sometimes made

3

mistakes. According to Yelp, in addition to relying on the filter, a site user can judge how much weight to give to any particular review by viewing the reviewer's profile, reading the reviewer's reviews, and assessing statistics regarding such reviews.

Yelp's filter is proprietary software developed by Yelp that is not distributed or sold to third parties because disclosure would expose Yelp to the risk of persons using the information to overcome Yelp's efforts to filter unreliable reviews. Yelp does not provide the source code or the algorithms to business owners or the general public.

In 2010, Yelp created a cartoon video to educate and contribute to the ongoing public dialog about the integrity of online reviews.

### 2. *Plaintiff's Complaint; Yelp's Demurrer*

On May 3, 2012, plaintiff filed this action, alleging causes of action for unfair competition and false advertising under the UCL and FAL.[3] Plaintiff, through a business

---

[3] California's UCL defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]." (Bus. & Prof. Code, § 17200.) In a suit under the UCL, a public prosecutor may collect civil penalties, but a private plaintiff's remedies are "generally limited to injunctive relief and restitution." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179; see Bus. & Prof. Code, §§ 17203, 17206.)

California's FAL makes it "unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (Bus. & Prof. Code, § 17500.) As with the UCL, an action for violation of the FAL may be brought either by a public prosecutor or by any person acting for the interests of itself, its members or the general public who has suffered injury in fact, and the remedies available to a successful private plaintiff include restitution and injunctive relief. (Bus. & Prof. Code, §§ 17204, 17535.) A "person" is defined as any individual, partnership, firm, association, or corporation. (§ 17506.)

4

entity,[4] owns the Mammoth Lakes restaurants Jimmy's Taverna, Rafters, and Red Lantern. Plaintiff instructed Jack Carter, the restaurant manager of Rafters, to obtain advertising on Yelp for Rafters. Commencing in June 2011 through January 2012, plaintiff purchased advertising for his restaurants on Yelp's website.

Plaintiff alleged that Yelp engaged in false advertising by claiming that each user review passed through a "filter" that gave consumers "the most trusted reviews." According to plaintiff, Yelp advertised that:

1. "Yelp uses a filter to give consumers the most trusted reviews";

2. "All reviews that live on people's profile pages go through a remarkable filtering process that takes the reviews that are the most trustworthy and from the most established sources and displays them on the business page. This keeps the less trustworthy reviews out so that when it comes time to make a decision you can make that [decision] using information and insights that are actually helpful";

3. "Rest assured that our engineers are working to make sure that whatever is up there is the most unbiased and accurate information you will be able to find about local businesses"; and

4. "Yelp is always working to do as good a job as possible on a very complicated task—only showing the most trustworthy and useful content out there"; and

5. "Yelp has an automated filter that suppresses a small portion of reviews—it targets those suspicious ones you see on other sites." (Boldface omitted.)

Plaintiff asserted these statements were misleading and untrue. Plaintiff asserted that Yelp did not use the filter to give consumers the most trusted reviews and the filter did not accurately separate the most trustworthy reviews from unreliable reviews, nor did the filter only post reviews from trusted sources. Instead, Yelp's automated filter suppressed more than only a small portion of reviews; allowed posts of the "most entertaining" reviews to be shown on the unfiltered portion of the website, regardless of

---

[4] Plaintiff owns the restaurants through a limited liability corporation known as Multiversal Enterprises Mammoth Properties LLC (MEMP).

5

the source; allowed posts of reviews to be shown on the unfiltered portion of a local business page regardless of whether the source was trustworthy or unbiased; and suppressed a substantial portion of reviews that were unbiased and trustworthy. Further, plaintiff asserted that Yelp's website contained reviews from persons who were "specifically and demonstrably biased against the businesses which they review." Based on plaintiff's background in software, plaintiff did not believe Yelp's filter was capable of distinguishing between trustworthy and untrustworthy reviews.

In particular, plaintiff asserted that while Rafters received 102 reviews on Yelp, 50 of those reviews were filtered. In addition, a reviewer named "Travis I." made false statements about plaintiff's restaurants, yet Yelp's filter did not catch those review. Plaintiff reported Travis I.'s reviews to Yelp, but Yelp did not take any action. In April 2012, plaintiff complained to Yelp about reviews of the Rafters and the Red Lantern, demanded changes in the display, threatened litigation aimed at public disclosure of Yelp's software, and sought the identity of the reviewer named Travis I. who had posted negative reviews.[5] On the other hand, according to Yelp, the Yelp filter caught several positive reviews of the plaintiff's restaurants that Yelp alleges were placed by an IP address associated with the restaurants.

Plaintiff suffered injury from the acts of Yelp, including spending money to purchase advertising from Yelp based on Yelp's representations that user reviews were filtered. Plaintiff sought an injunction to stop Yelp from continuing to engage in untrue and misleading representations.

Yelp demurred to the complaint, arguing that the proper plaintiff was MEMP, the entity that directly owned the restaurants. Yelp also filed a motion to strike under section 425.16. On September 7, 2012, plaintiff, without changing his status as an individual plaintiff, filed a first amended complaint (FAC) alleging that, among other things,

---

[5] Plaintiff simultaneously filed an action against "John Doe," (Travis I., the negative reviewer of plaintiff's restaurant), seeking damages for libel. Plaintiff did not file a notice of related cases in this action or in his action against "John Doe."

6

plaintiff did not seek monetary damages of any kind under the UCL or FAL.  Plaintiff sought an order enjoining Yelp from making any statements concerning its filter which were untrue or misleading, filtering user reviews on the Yelp website while falsely advertising that the unfiltered reviews posted were fair, trustworthy, or unbiased.

### 3. *Yelp's Motion to Strike*

Yelp filed a second motion to strike, arguing that plaintiff's complaint targeted protected activity under section 425.16, subdivisions (e)(3) and (e)(4) and by his complaint, plaintiff sought to interfere with both Yelp's review publishing process and Yelp's ability to offer opinions about that process, which conduct interfered with Yelp's free speech rights and targeted speech that appeared in a public forum and was a matter of public interest.

Further, Yelp argued that plaintiff would not prevail on the merits because plaintiff had suffered no injury and thus lacked standing under both the UCL and FAL; even if plaintiff had suffered injury in the form of purchasing advertising, the facts showed that plaintiff did not individually purchase the advertising for Rafter.  Further, the Communications Decency Act (CDA), title 47 United States Code section 230 precluded liability because the CDA provided that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" the CDA.  Finally, Yelp contended its statements constituted nonactionable opinions because a reasonable person would not interpret Yelp's statements about its filter as a guarantee of its performance; rather, the statements were general opinions about Yelp's evolving filtering goals.

### 4. *Plaintiff's Opposition to Yelp's Motion to Strike*

Plaintiff's opposition detailed that plaintiff was the manager of an entity that owned three Mammoth Lakes restaurants:  Jimmy's Taverna, Rafters, and Red Lantern. Plaintiff instructed Jack Carter, the restaurant manager of Rafters, to obtain advertising on

7

Yelp for Rafters. In purchasing advertising, plaintiff relied on Yelp's statements concerning its filter in purchasing advertising, but soon realized that Yelp's representations concerning its filter were not accurate because of the 102 reviews Rafters received, 50 had been filtered. Further, Rafters received unfiltered negative reviews from a reviewer who made false statements about the restaurant, yet Yelp's filter did not catch these false reviews.

Addressing the merits of Yelp's motion to strike, plaintiff argued that the commercial speech exemption of section 425.17, subdivision (c), applied to Yelp's statements.[6] Plaintiff argued that his action arose out of the five direct statements of fact from Yelp's website concerning its review filer, which statements were made for the purpose of promoting the advertising services offered by Yelp. In addition, plaintiff asserted that the FAC was brought solely in the public interest to enjoin Yelp's false statements about its review filter and was exempt from attack by virtue of section 425.17, subdivision (b).[7]

---

[6] Section 425.17, subdivision (c) provides that section 425.16 "does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . . if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services; and [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue."

[7] Section 425.17, subdivision (b) provides that "Section 425.16 does not apply to any action brought solely in the public interest or on behalf of the general public if all of the following conditions exist: [¶] (1) The plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which the plaintiff is

8

In reply, Yelp argued that neither of the exemptions of section 425.17, subdivisions (b) or (c) applied; further, plaintiff could not show a probability of prevailing on the merits under section 425.16 because he lacked standing; Yelp's statements were not deceptive as a matter of law; and the CDA barred plaintiff's claims.

### 5. Trial Court Ruling

On January 25, 2013, the trial court granted Yelp's special motion to strike. The trial court found that Yelp met its initial burden of establishing that its statements arose from protected activity because statements regarding the filtering of reviews on a social media site such as Yelp are matters of public interest and are therefore protected. Further, plaintiff failed to establish the public interest exemption of section 425.17, subdivision (b) applied because the action was not brought solely in the public interest as plaintiff had a personal financial stake in the case based on negative reviews. The court found plaintiff also failed to show the commercial speech exemption of section 425.17, subdivision (c) applied because the statements regarding the reviews did not relate to the selling of advertising and plaintiff failed to show that the statements were statements of fact and not opinion or puffery. Finally, the court found plaintiff failed to establish a probability of prevailing on the merits because plaintiff, who was not the owner of the restaurants, lacked standing and Yelp's alleged misrepresentations were puffery and opinion.

## DISCUSSION

Plaintiff argues that under section 425.17, if an action is prosecuted solely in the public interest or against a person engaged in the business of selling or leasing goods or services who makes statements about those goods and services, the action is not subject to the provisions of section 425.16 as a SLAPP suit. (§ 425.17, subds. (b), (c).) First,

---

a member. A claim for attorney's fees, costs, or penalties does not constitute greater or different relief for purposes of this subdivision. [¶] (2) The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public or a large class of persons. [¶] (3) Private enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter."

plaintiff argues that this action was brought in the public interest because the FAC alleges Yelp engaged in the advertising alleged with intent to induce members of the public to visit its website and view advertisements and reviews and that Yelp engaged in false advertising to the public, including plaintiff; furthermore, the action, if successful, will enforce an important right and confer a benefit upon the public because it will put an end to Yelp's false advertising and unfair competition. Second, plaintiff argues that Yelp's commercial speech is exempted from the protections of the anti-SLAPP statute because the action arises out of Yelp's false statements concerning the accuracy and superiority of its review filter and Yelp's statements were made for the purpose of promoting the advertising services Yelp offered, and such statements were actionable because they were statements of fact, not opinion.

Yelp counters that plaintiff has failed to show the public interest exemption of subdivision (b) applies because here plaintiff seeks relief different from or greater than members of the public at large; rather, the FAC discloses that plaintiff has a significant private interest; in addition, the action will not benefit the public because the only issue at stake is plaintiff's personal interest; and plaintiff's financial interest in Rafters is substantial and thus he can meet the burdens of litigation. Further, plaintiff has failed to establish that the commercial speech exemption applies because (1) although Yelp sells advertising, it is primarily engaged in providing a free public forum for members to read and write reviews about local business, services, and other entities; (2) the statements made do not concern commercial speech because they are not directed at advertising; and (3) the intended audience of the statements is not an actual or potential buyer or consumer because the intended audience is potential reviewers, not buyers of advertising; (4) the statements are not statements of fact, but are puffery because the statements make clear the filtering software is not perfect. Finally, Yelp asserts that plaintiff did not suffer actual economic injury and has no standing because the owner of the restaurants is MEMP.

10

We conclude that plaintiff's action is squarely within the commercial speech exemption of section 425.17, subdivision (c) and reverse.

## I.    Standing

Yelp contends that the business entity, MEMP, that owns the restaurants receiving reviews on its website is the proper party plaintiff in this action, because it is the party who has suffered alleged damages based on fraudulent reviews. While we agree the proper plaintiff to this action is the entity suffering damages, this defect in naming the real party in interest is not fatal to this action.[8]

Every action must be prosecuted by the real party in interest. (§ 367.) Under certain circumstances, a complaint may be amended to substitute a new plaintiff where it is determined the named plaintiff is not the proper party to maintain the alleged claims, so long as the amendment does not present an entirely new set of facts and the defendant is not prejudiced. The substitution of a new plaintiff is proper where original plaintiff was found to have no standing to prosecute action after the original complaint has been filed. (*Jensen v. Royal Pools* (1975) 48 Cal.App.3d 717, 721.) Thus, where a shareholder seeks to enforce a claim belonging to the corporation, the complaint may be amended to substitute the corporation as the named plaintiff. (See, e.g., *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 21.) With respect to the amendment of Business and Professions Code section 17204, which limited standing in "unfair competition" actions under Business and Professions Code section 17200 to persons who had suffered "injury in fact" and "lost money or property" (unlike former law, under which plaintiffs could sue

_____

[8] A plaintiff's right to sue is not relevant to the first prong of the section 425.16 analysis, but to the second prong of the analysis that focuses on "whether [an opposing] plaintiff has established a probability of prevailing on the claim." (*City of Riverside v. Stansbury* (2007) 155 Cal.App.4th 1582, 1594 [plaintiff's right to sue is not addressed on first prong of section 425.16 analysis but may be a proper subject of demurrer].) Here, we do not reach the second prong of the section 425.16 analysis because we conclude that plaintiff's complaint is subject to the exemption of section 425.17; nonetheless, because the standing issue is of jurisdictional importance and defendant raised it below, we address it here.

on behalf of the general public), amendment is proper to substitute a plaintiff who meets the modified standing requirement in place of one who does not. (*Foundation for Taxpayer & Consumer Rights v. Nextel Communications, Inc.* (2006) 143 Cal.App.4th 131, 136.)

Substitution of new plaintiffs requires leave of court pursuant to section 473. Although there is a policy of great "liberality" in permitting amendments to pleadings, the trial court must consider various factors, including whether the substitution would prejudice the defendant (e.g., by delaying trial, or increasing discovery burden). (*Royal Thrift & Loan Co. v. County Escrow, Inc*. (2004) 123 Cal.App.4th 24, 41–42; *Jensen v. Royal Pools*, *supra*, 48 Cal.App.3d at p. 721.) Here, the current plaintiff, though an individual and not the business entity that is the direct owner of the restaurants, does not appear to have had an inappropriate motive in naming himself as plaintiff.[9] Thus, to the extent that the party suffering damages in this case is MEMP, as opposed to plaintiff, plaintiff should be permitted to move to amend the complaint in this action to substitute the proper party plaintiff and demonstrate a lack of prejudice to Yelp from the amendment.

## II. Yelp's Representations About Its Review Filter Constitute Commercial Speech Squarely Within the Exemption of Section 425.17, Subdivision (c)

### A. *Special Motions to Strike Under Section 425.16*

Section 425.16, the anti-SLAPP statute is aimed at curbing "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Section 425.16 extends protection to conduct that furthers the exercise of free speech in connection with an issue of public interest. (§ 425.16, subd. (e)(4).) Section 425.16 provides that a "cause of

---

[9] The UCL provides that "the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (Bus. & Prof. Code, § 17201.) Similarly, the FAL provides that a "'person'" is defined as "any individual, partnership, firm, association, or corporation." (Bus. & Prof. Code, § 17506.)

action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The Legislature commands that the provisions of the anti-SLAPP statute be broadly construed. (§ 425.16, subd. (a); *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735.)

Subdivision (e) of section 425.16 delineates the type of speech or petitioning activity protected. Such acts include (1) written or oral statements "made before a legislative, executive, or judicial proceeding"; (2) written or oral statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body"; (3) written or oral statements "made in a place open to the public or in a public forum in connection with an issue of public interest"; or (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) Yelp here relies on section 425.16, subdivisions (e)(3) and (e)(4).

Ruling on an anti-SLAPP motion is a two-step process. First, the trial court must determine whether the defendant has made a prima facie showing that the challenged cause of action arises from protected activity. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.) If, and only if, the defendant makes that showing must the trial court proceed to the second step—determination of whether the plaintiff has shown a probability of prevailing on the claim. (*Ibid.*) The appellate court reviews a ruling on an anti-SLAPP motion de novo, using the same two-step process. (*Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1387; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 478.)

The party making a special motion to strike must make a prima facie showing that the plaintiff's cause of action arises from the defendant's free speech or petition activity. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) Once the defendant makes a prima facie

13

showing, "the burden shifts to the plaintiff to . . . 'make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor.'" (*Church of Scientology*, *supra*, 42 Cal.App.4th at p. 646.)  In making these determinations, the trial court considers the pleadings and the supporting and opposing affidavits setting forth the facts upon which liability or defense is predicated.  (§ 425.16, subd. (b)(2); *Church of Scientology*, at p. 646.)

An order granting or denying a motion to strike under the anti-SLAPP statute is appealable.  (§ 425.16, subd. (j).)  On appeal, we exercise our independent judgment to determine whether the litigation arises out of protected activity and whether the plaintiff is likely to prevail.  (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906.)

### B.      The Commercial Speech Exemption of Section 425.17, Subdivision (c)

The Legislature enacted section 425.17 in response to a "disturbing abuse" of section 425.16.  (§ 425.17, subd. (a).)  Subdivision (c) of section 425.17 "enumerate[s] circumstances where the special motion to strike screening mechanism is unavailable." (*Sunset Millennium Associates, LLC v. LHO Grafton Hotel, L.P.* (2006) 146 Cal.App.4th 300, 312.)  Under the two-prong test of section 425.16, whether a section 425.17 exemption applies is a first-prong determination.  (See *Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 330 (*Brill Media*), disapproved on other grounds in *Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 25 [applicability of § 425.17, subd. (c) exemption is a first-prong analysis under § 425.16].) *Brill Media* reasoned that section 425.17, subdivision (c) begins with the words, "Section 425.16 does not apply . . . ." and then specifies an array of circumstances in which it does not apply.  (*Brill Media*, at p. 330.)  As set forth in *Simpson Strong-Tie Company*, however, contrary to the holding of *Brill Media*, the burden is on the plaintiff to show that an exemption of section 425.17 applies.  (*Simpson Strong-Tie Company*, at p. 26.)

Section 425.17, subdivision (c) provides in relevant part that "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services . . .  [¶]  (1) The statement or conduct

14

consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services; and [¶] (2) the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . ." A party must satisfy both prongs of this exemption to benefit from the exemption of section 425.17, subdivision (c). (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 273.)

The legislative history indicates this legislation is aimed squarely at false advertising claims and is designed to permit them to proceed without having to undergo scrutiny under the anti-SLAPP statute. Proponents of the legislation argued that corporations were improperly using the anti-SLAPP statute to burden plaintiffs who were pursuing unfair competition or false advertising claims. The proponents noted that law seminars were being conducted on the unfair competition law, "encouraging corporations to use the SLAPP motions as [a] new litigation weapon to slow down and perhaps even get out of litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended Jul. 8, 2003; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003.)

As the court explained in *Kasky v. Nike, Inc*. (2002) 27 Cal.4th 939, a false advertising case under the UCL and FAL, "when a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message. [¶] In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or

customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. . . . [¶] [I]n deciding whether speech is commercial, two relevant considerations are advertising format and economic motivation. [Citation.] These considerations imply that commercial speech generally or typically is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting. Speech in advertising format typically, although not invariably, is speech about a product or service by a person who is offering that product or service at a price, directed to persons who may want, and be willing to pay for, that product or service. . . . [Citation.] Economic motivation likewise implies that the speech is intended to lead to commercial transactions, which in turn assumes that the speaker and the target audience are persons who will engage in those transactions, or their agents or intermediaries." (*Kasky*, at pp. 960–961, italics omitted.) The court in *Kasky* continued, "[f]inally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Id.* at p. 961.)

Thus, an editorial layout in a magazine that placed a cigarette ad near depictions of plaintiff was not commercial speech within the section 425.17, subdivision (c) exemption. (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 676.) Plaintiff, a rock musician, asserted that a cigarette ad placed near an editorial layout constituted misappropriation of his name, misappropriation of his right to publicity, and unfair business practices under the UCL. (*Stewart*, at p. 674.) The court rejected the plaintiff's contention that the action was within the subdivision (c) exemption: "It is true that defendant[s] [are] primarily engaged in the business of selling goods,' however, as

16

plaintiffs concede, the goods [defendants] sell are copies of Rolling Stone magazine, not Camel cigarettes. More significantly, the statement or conduct at issue here did not consist of 'representations of fact about the business operations, goods or services' of Rolling Stone or of any of defendants' business competitors. Instead, the representation at the center of this lawsuit is the representation that plaintiffs and their fellow musicians endorse the sale and use of Camel cigarettes. Accordingly, the first condition set forth in section 425.17, subdivision (c), is not satisfied with respect to defendants and this limited exemption is therefore inapplicable." (*Stewart*, at pp. 676–677.)

Here, plaintiff's claims satisfy both prongs of section 425.17, subdivision (c). Although Yelp's website is a public forum and contains matters of public concern in its reviews of restaurants and other businesses (*Hupp v. Freedom Communications, Inc.* (2013) 221 Cal.App.4th 398, 404), unlike the editorial content of *Stewart v. Rolling Stone LLC*, *supra*, 181 Cal.App.4th 664, Yelp's statements about its review filter—as opposed to the content of the reviews themselves—are commercial speech about the quality of its product (the reliability of its review filter) intended to reach third parties to induce them to engage in a commercial transaction (patronizing Yelp's website, which patronage induces businesses on Yelp to purchase advertising).

*1.  Yelp's Statements About Its Review Filter Consist of Representations of Fact about Yelp's Website That Are Made for the Purpose of Obtaining Approval for, Promoting, or Securing Advertisements on Yelp's Website, and Yelp's Statements Were Made in the Course of Delivering Yelp's Website*

Yelp's statements about the efficacy of its review filter consist of representations of fact about its services, and are not mere puffery or opinion. "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. [Citation.] 'The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions.' [Citation.] Thus, a statement that is quantifiable,

17

that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.  [Citation.]"  (*Newcal Industries, Inc. v. Ikon Office Solution* (9th Cir. 2008) 513 F.3d 1038, 1053.)

Thus, Yelp's statements that ""Yelp uses a filter to give consumers the most trusted reviews"; "All reviews that live on people's profile pages go through a remarkable filtering process that takes the reviews that are the most trustworthy and from the most established sources and displays them on the business page.  This keeps the less trustworthy reviews out so that when it comes time to make a decision you can make that using information and insights that are actually helpful"; "Rest assured that our engineers are working to make sure that whatever is up there is the most unbiased and accurate information you will be able to find about local businesses"; "Yelp is always working to do as good a job as possible on a very complicated task—only showing the most trustworthy and useful content out there"; and "Yelp has an automated filter that suppresses a small portion of reviews—it targets those suspicious ones you see on other sites" are more than puffery, they are statements of fact.  Yelp's statements are factual because they are intended to induce consumer reliance on Yelp's reviews by making specific and detailed statements intended to induce reliance, such as:  the filter "give[s]" consumers the "most trusted" reviews, and Yelp's engineers (a word inspiring confidence) are working to provide the "most unbiased and accurate" information available.  Although in making these statements, Yelp may use words of emphasis ("remarkable filtering process," "most trustworthy," "most established sources"), Yelp's specific representations about the accuracy of its review filter go beyond mere expressions of opinion or puffery and hyperbole; rather Yelp speaks with the authority of a website that intends to attract users with the accuracy of its filter.

Thus, it is illogical to conclude that Yelp's statements that all reviews on its website are filtered is intended to mean anything other than that.  If Yelp intended the statements as puffery or opinion, in the context of Yelp's advertising-driven website such

18

statements would have limited utility; thus Yelp would have had no legitimate purpose in making those statements about its review filter.

2. *Yelp's Intended Audience Is an Actual or Potential Buyer or Customer, or a Person Likely to Repeat the Statement to, or Otherwise Influence, an Actual or Potential Buyer or Customer*

Yelp's audience consists of reviewers, readers of reviews, and businesses that may or may not purchase advertising on Yelp's website. Although Yelp only receives direct revenue from those businesses that advertise, such businesses would not be advertising on Yelp without the potential benefit they could obtain from users' reviews and without assurances that potential patrons of their business establishments would be reading only reliable reviews. Further, as Yelp's revenue stream indicates, Yelp is primarily in the business of providing advertising to businesses; the user reviews of businesses are a device whereby prospective users and reviewers are attracted to Yelp's website. Thus, Yelp's statements about the accuracy and performance of its review filter are designed to attract users and ultimately purchasers of advertising on its site.

We note that by his complaint plaintiff does not seek to stop Yelp's use of the filter, or obtain information on the mechanics of the filter. Instead, plaintiff seeks to enjoin commercial statements of ostensible fact that plaintiff alleges are false and misleading. Thus, to the extent plaintiff were to obtain the relief sought (an injunction), such relief would not interfere with Yelp or its users' commercial speech: Users can continue to post and read reviews; Yelp can continue to solicit advertising based upon the content of its site (user reviews and business advertising); and Yelp can continue to use its review filter. Narrowly targeted injunctive relief will not affect the content of Yelp's reviewers statements or the availability of Yelp's reviewers' statements.

As we conclude that plaintiff has established his action is subject to the exemption of section 425.17, subdivision (c), we need not consider the applicability of the exemption of section 425.17, subdivision (b) under the first prong analysis, and also need not

19

consider the second prong of the section 425.16 analysis, namely, whether plaintiff has a reasonable likelihood of prevailing on the merits.

## III. The Federal Communications Decency Act Does Not Apply

Yelp asserts that the CDA, title 47 United States Code section 230, bars plaintiff's claims because it provides protections for editorial functions exercised by website operators with regard to third-party material; courts uniformly hold that claims based on a website's editorial decisions (publication, or failure to publish, certain third-party conduct) is barred by section 230.

Section 230 of the CDA provides in relevant part, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (47 U.S.C. § 230(c)(1).) However, as this language demonstrates, Yelp's argument is misplaced. Nowhere does plaintiff seek to enjoin or hold Yelp liable for the statements of third parties (i.e., reviewers) on its website. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter.

20

## DISPOSITION

The order is reversed, and plaintiff shall be given an opportunity to move to amend his complaint to substitute the real party in interest in this action as plaintiff. James Demetriades is to recover his costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21