Filed 3/24/25  Weather Group v. McDonald's USA CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WEATHER GROUP, LLC, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MC DONALD'S USA, LLC, <br><br> Defendant and Respondent. | B336996 <br> B339981 <br><br> (Los Angeles Super. Ct. No. 23STCV10045) |

APPEAL from an order of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Affirmed.

Miller Barondess, Louis R. Miller and Eleanor S. Ruth for Plaintiffs and Appellants.

Hueston Hennigan, John C. Hueston and Moez M. Kaba for Defendant and Respondent.

_____

Two media companies sued McDonald's for allegedly reneging on a promise to allocate more advertising dollars to racially diverse media companies, production houses, and content creators. They claim harm because they submitted a $30 million advertising proposal, but McDonald's spent only $2.1 million with them. The trial court granted McDonald's motion to strike the complaint as a Strategic Lawsuit Against Public Participation (SLAPP). (Code Civ. Proc., § 425.16.)[1]

On de novo review, we conclude that McDonald's announcement of its diversity plans is not commercial speech. (§425.17.) McDonald's was joining a national dialog on racial inequity—an issue of public concern. (§ 425.16, subd. (e).) Appellants did not carry their burden of showing they are likely to prevail on the merits of their "false promise" claim. We affirm.

## FACTS AND PROCEDURAL HISTORY
### Allegations in Appellants' Complaint

Appellants are Weather Group, LLC and Entertainment Studios Networks, Inc.[2] They are part of a conglomerate of media companies owned by entrepreneur Byron Allen, whose Allen Media Group (AMG) is the largest Black-owned media company in the country. Respondent McDonald's USA, LLC, a foodservice company, pays significant sums to advertise in the United States.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] Appellants own The Weather Channel, Comedy.tv, Justice Central.tv, Recipe.tv, Cars.tv, MyDestination.tv, and Pets.tv.

In 2020, nationwide protests were sparked by the televised murder of George Floyd, an African-American, by a White police officer. In the wake of the murder, American corporations spoke against racial injustice and pledged some $50 billion to address it. McDonald's pledged $1 million, but did not make significant efforts to support the Black community.

In 2021, McDonald's announced a "Four-Year Plan" (Plan) to "accelerat[e] the allocation of advertising dollars to diverse-owned media companies, production houses and content creators." It planned to increase spending with Black-owned operations from 2 percent to 5 percent of its advertising budget. At the time, its spending with AMG was de minimis. Appellants allege that "to meet its public commitments . . . McDonald's would need to spend approximately $50 million per year to advertise on Plaintiffs' properties."

After learning of the Plan, appellants spent time and effort creating a proposal showing how McDonald's could fulfill its commitment by advertising with them. Despite these efforts, McDonald's did not increase its advertising with appellants. From this, appellants infer that McDonald's never intended to fulfill its commitment to spend 5 percent of its budget with Black-owned companies.

In May 2023, appellants filed this lawsuit for "Fraud–False Promise." They allege that McDonald's "made a material misrepresentation when it stated that it would increase its spend with Black Owned Media from 2% in 2021 to 5% in 2024." It made this promise "with no intention to honor it," and "intended to defraud the general public, its shareholders and investors, the government, and Black Owned Media, including plaintiffs."

Appellants relied on McDonald's promise to their detriment and were harmed in the amount of $100 million.

### McDonald's Motion to Strike

McDonald's moved to strike the complaint. (§ 425.16.) Its 2021 announcement of the Plan addressed an issue of public interest on McDonald's corporate Web site. Appellants' pleading acknowledges that the Plan was part of a national dialog about race and inequality. As such, McDonald's announcement was protected activity.

McDonald's denied that its announcement of the Plan was commercial speech. The pleading states that the Plan was an effort to cast McDonald's as a racially sensitive business. It was not an advertisement directed to an audience on paid media. If the Plan had a positive effect on sales, this indirect result did not mean that its purpose was to sell goods or services. (§ 425.17, subd. (c).) The Plan is not a representation of fact, only a goal to take future action.

McDonald's argued that appellants cannot prevail on their claim. It is on track to meet Plan goals. It did not hire appellants because they are "poorly performing, lowly rated, and misaligned with McDonald's marketing plans and priorities." Appellants cannot show that McDonald's never intended to carry out the Plan, or intended to induce reliance, or that they reasonably relied on the announcement of the Plan or were harmed.

In support of the motion to strike, a McDonald's vice-president declared that the company uses a standardized process to evaluate potential media partners for national advertising. Appellants have submitted advertising proposals to McDonald's since 2013, but were not chosen because of their older, smaller

4

audiences and low ratings. Apart from working with media companies, McDonald's uses production houses and content creators to create advertising content. McDonald's increased spending with Black-owned companies from 2.3 percent in 2021 to 4 percent in 2023, and planned to reach 5 percent in 2024.

McDonald's chief marketing officer declared that she helped develop the Plan. Its goals were based on what an analysis found to be feasible. McDonald's hosted a media partner summit to identify opportunities that align with the company's marketing strategy. A marketing council keeps McDonald's accountable to the goals in the Plan.

## Appellants' Opposition to the Motion

Appellants argued that the Plan promised to increase spending with Black-owned media from 2 percent to 5 percent by 2024, "[b]ut this was an empty promise built upon a lie . . . [a]nd McDonald's had no intent to fulfill its promise." They wrote, "Plainly, McDonald's made a false promise to make itself look good to further its business interests."

Appellants asserted that AMG, their parent company, comprises more than 90 percent of Black-owned media, yet McDonald's barely uses its services. If McDonald's was going to meet its commitment, it would have to spend at least $9 million with appellants in 2021; $13.5 million in 2022; $18 million in 2023; and $22.5 million in 2024.

Appellants argued that the anti-SLAPP statute does not apply because McDonald's announcement was commercial speech that sought "to convince customers that it was committed to the cause of racial equity, with the expectation that customers would be encouraged to continue buying products from McDonald's." Appellants characterized McDonald's Plan as a factual

representation about its business operations for the purpose of promoting sales of its goods. In support of its opposition, appellants offered a McDonald's Global DEI (diversity, equity and inclusion) Report discussing its goal to "break[ ] down barriers so more people can access the opportunities for prosperity our organization offers."

AMG's chief revenue officer declared that AMG is the largest Black-American owned media company in the country. Though AMG owns 90 percent of all Black-owned media, McDonald's did not advertise with it until 2021, when it spent $300,000 on two AMG companies. In 2022–2023, it increased spending with AMG to $2.1 million; in 2023–2024, McDonald's planned to spend $1.33 million with AMG.

AMG spent time and resources preparing proposals for McDonald's to spend $30 million in advertising, but only received $2.1 million, amounting to less than 1 percent of McDonald's national budget. McDonald's should be spending at least $25 million annually with Black-owned media to meet Plan goals.

### McDonald's Reply

McDonald's argued that speech is not commercial just because it might be "good for business" when a company participates in a national dialogue. Its announcement of the Plan did not mention its products or restaurants, and promising to use more diverse marketing contractors does not promote the sale of hamburgers to prospective customers. Section 425.17 applies only to "comparative advertising," and the Plan is not advertising at all. A company's economic motivation to look good does not make a communication commercial speech, absent references to products. A commitment to use diverse companies is not a false statement of fact relating to a business transaction.

6

Appellants did not dispute that McDonald's made a public statement in connection with an issue of public interest. They did not show a probability of success on the merits of their claim: The Plan was not a clear and unambiguous promise; appellants cannot prove nonperformance of the Plan, or that McDonald's did not intend to perform; appellants cannot show McDonald's intended to induce them to prepare advertising proposals; or prove actual or reasonable reliance. It was unreasonable for appellants to believe that all of McDonald's allocation would go to them.

## The Trial Court's Ruling

The court granted the motion to strike. It wrote that the announcement of the Plan was not commercial speech—it was not made for the purpose of promoting sales of goods or services; McDonald's products are not mentioned in the announcement, and saying it was "good for business" could mean it created goodwill rather than selling food. This was not "comparative advertising" that falls under section 425.17.

The court noted that appellants do not dispute that McDonald's 2021 announcement was a public statement made in connection with a public issue. Their claim arises from that announcement. Appellants did not meet their burden of showing a probability of prevailing on the merits. They did not present competent, admissible evidence that McDonald's did not perform or made a promise with no intention of performing it, or that it intended to induce reliance, or that appellants reasonably relied on a promise.

7

## DISCUSSION
### Overview of SLAPP Procedures

Courts must strike causes of action arising from a defendant's exercise of First Amendment rights unless the plaintiff shows a probability of prevailing on the claim. (§ 425.16, subd. (b)(1).) The law is construed "broadly" (*id.,* subd. (a)) as "a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) An order granting an anti-SLAPP motion is appealable. (§ 425.16, subd. (i).) Review is de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

A cause of action is exempt from the anti-SLAPP statute if it arises from commercial speech. (§ 425.17.) Determining if the commercial speech exemption applies is a threshold issue. (*Xu v. Huang* (2021) 73 Cal.App.5th 802, 807.) If it applies, "the challenged speech or conduct is not protected by the anti-SLAPP statute." (*BioCorRx, Inc. v. VDM Biochemicals, Inc.* (2024) 99 Cal.App.5th 727, 735 (*BioCorRx*).) "We review the applicability of the commercial speech exemption independently." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 26 (*Simpson*).) The exemption is narrowly construed (*id.* at p. 22), and the burden of proving it falls on the plaintiff who seeks to benefit from it (*id.* at p. 26).

If the commercial speech exemption does not apply, a two-step analysis is done. First, the moving defendant must show that plaintiff's claims arise from protected First Amendment activity. The second step shifts the burden to the plaintiff to show a probability of prevailing on the merits. If the showing is not sufficient to sustain a favorable judgment, the claims are

8

stricken.  (*Baral v. Schnitt, supra,* 1 Cal.5th at p. 396; *Olson v. Doe* (2022) 12 Cal.5th 669, 678–679.)

### The Commercial Speech Exemption

The Legislature limited the scope of the anti-SLAPP statute by enacting section 425.17.  It exempts "a cause of action arising from commercial speech when (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's . . . business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience" is an actual or potential buyer or customer.  (*Simpson, supra,* 49 Cal.4th at p. 30.)

If all four elements are met, a statement or conduct is exempt from the anti-SLAPP law, even if it "concerns an important public issue."  (§ 425.17, subd. (c).)  As we shall see, all the elements are not met here.

The Plan set a goal to use diverse marketers.  It " 'is not a representation of fact, but an agreement to take certain actions in the future.' "  (*Simpson, supra,* 49 Cal.4th at p. 31 [a lawyer's promise to help people who responded to his advertisement was not a representation of fact]; *Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 840–841 [a promise to process franchise applications " 'without undue delay' " is not a representation of fact]; *Six4Three, LLC v. Facebook, Inc.* (Mar. 12, 2025, A166007, A167416) ___ Cal.App.5th ___ [2025 Cal.App. Lexis 148, *24] [an announcement that developers

" 'would have access' " and that Facebook would support opportunities to build a business on the platform was a promise to take future action, not a representation of fact].)

Appellants argue that McDonald's 2021 announcement misrepresented that 2 percent of its 2021 budget was spent on Black-owned companies. Assuming they are correct, their cause of action does not arise from this statement. Rather, the pleading claims that McDonald's planned to increase future spending, and appellants were harmed because they submitted proposals for *future* projects that were not accepted.

The Plan did not sell goods or services. "[C]ommercial speech consists at its core of ' "speech proposing a commercial transaction." ' " (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 956.) No commercial transaction was proposed to consumers. Though an advertisement may not be protected if it " 'links a product to a current public debate' " (*id.* at p. 957), no product is linked to a public debate here. The Plan did not ask the public to patronize a McDonald's restaurant or reference a product.

Appellants cite cases involving goods or services, which is not true here. (See *BioCorRx, supra,* 99 Cal.App.5th at pp. 738–739 [defendant made representations of fact about its product to treat drug addiction in press releases]; *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 310 [Yelp's statements were "commercial speech about the quality of its product"]; *JAMS, Inc. v. Superior Court* (2016) 1 Cal.App.5th 984, 995 [JAMS's statement concerned a provider's "qualifications to provide ADR services" and how it provides ADR services]; *Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 790–791 [defendant described development and FDA approval of a drug].)

10

In context, amid the national debate on racial justice, McDonald's sought to cast itself as a good corporate citizen.[3] Any effect on sales was theoretical. Among some segments of the population, a company's DEI aspirations could lower sales.

Economic motivation " 'would clearly be insufficient by itself to turn the [communication] into commercial speech.' " (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1290.) "Under section 425.17, it is not sufficient to show that the statement at issue could have had the effect of promoting or securing additional business. Rather, it is required that the plaintiff show that the statement was made '*for the purpose of*' promoting the defendant's goods or services, or in the course of delivering those goods or services." (*Hu & Assocs., LLC v. New Life Senior Wellness Ctr., LLC* (C.D. Cal. July 7, 2017) 2017 U.S. Lexis 226210, *31.)

McDonald's Plan to use racially diverse marketers is not a claim about the production of its burgers or its treatment of workers. (See *Kasky v. Nike, Inc., supra,* 27 Cal.4th at p. 968 [Nike's false and misleading claim that its products are made in factories with good working conditions was commercial speech].) McDonald's was not making a statement about labor practices at

---

[3] The trial court sustained a hearsay objection to a 2021 letter from counsel, warning McDonald's that failure to do business with appellants is discriminatory. Appellants argue that the letter was not offered for the truth of its contents, but to show that McDonald's reacted by issuing the Plan. It is pure speculation that the Plan was a reaction to a letter. The record shows that McDonald's pledged in 2020 to address racial inequity by increasing spending with diverse groups and indicated that it was formulating changes; it then issued the Plan. Excluding the letter was not an abuse of discretion.

its food production facilities.  Its use of outside media companies, content creators and production houses is peripheral to McDonald's core business of making food.

Appellants point to boilerplate language at the end of the press release under the heading, "About McDonald's USA."  It states that McDonald's "serves a variety of menu options . . . to nearly 25 million customers every day" and 95 percent of its restaurants are independently owned.  This is not an advertisement for a product or service, and it would torture the English language to say otherwise.

We must construe the commercial speech exemption narrowly.  (*Simpson, supra,* 49 Cal.4th at p. 22.)  As the parties seeking its benefit, appellants have not carried their burden of showing that section 425.17 applies here.

### McDonald's Protected Speech Activities

The first prong of a SLAPP analysis focuses on "the defendant's *activity* that gives rise to his or her asserted liability" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92) and "whether the cause of action is *based* on the defendant's protected free speech or petitioning activity" (*id.* at p. 89).  An act in furtherance of a person's First Amendment rights includes "any written or oral statement or writing made in . . . a public forum in connection with an issue of public interest" or "any other conduct in furtherance of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3), (4).)

Appellants do not address the first prong of the analysis. By failing to address it, they concede that McDonald's activity in announcing the Plan falls within section 425.16 as speech made in connection with an issue of public interest.

12

## Probability of Prevailing

Appellants must show a probability of prevailing on their "false promise" claim to defeat the motion to strike. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) Though "minimal merit" is needed to survive an anti-SLAPP motion (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89), appellants did not make the minimal merit showing here.

Appellants bring their claim under Civil Code section 1711. It states: "One who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit."

Civil Code section 1711 applies to communications that "the speaker or writer intends to reach a considerable number of persons." (*Cohen v. Citizens Nat'l Trust & Sav. Bank* (1956) 143 Cal.App.2d 480, 486.) The statute "does not independently proscribe any conduct." (*Woulfe v. Universal City Studios LLC* (C.D. Cal. 2022) 2022 U.S. Dist. Lexis 235602, *38.) Instead, it "simply points out that one who makes false representations with fraudulent intent need not have any particular victim in mind." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092.)

Civil Code section 1709 creates liability for fraud: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Promissory fraud requires: (1) a promise regarding a material fact; (2) no intent to perform when the promise is made; (3) intent to deceive or induce the promisee to enter a transaction; (4) reasonable reliance; (5) nonperformance; and (6) resulting damage. (*Gruber v. Gruber* (2020) 48 Cal.App.5th 529, 540.)

13

McDonald's announced a plan to "accelerat[e] the allocation of advertising dollars to diverse-owned media companies, production houses and content creators" and increase spending with Black-owned companies from 2 to 5 percent between 2021 and 2024. Appellants allege that "McDonald's lied about its spend with Black Owned Media and never had an intent to fulfill its commitment to reach 5% by 2024." The pleading states that for McDonald's to fulfill its commitment, it "would need to spend approximately $50 million per year to advertise on Plaintiffs' properties."

The Plan cannot form the basis for appellants' fraud claim.

First, the Plan is not an actionable promise.[4] It set a goal to increase future spending with unnamed media companies, production houses and content creators, without stating how the money would be divided among the three groups. The plain language of the Plan contradicts appellants' claim that it was a promise to spend $50 million with them specifically.

Second, apart from their inability to show a promise, appellants did not demonstrate that McDonald's intended to deceive them or induce their reliance. They made a pitch for business, as they had done regularly since 2013. Nothing shows that McDonald's solicited their proposal, and the Plan did not specify how candidates would be selected. Appellants could not

---

[4] A plan is a "goal" or "aim." (Merriam-Webster.com Dictionary, https://www.merriam.webster.com/dictionary/plan.) By contrast, a promise is "a legally binding declaration that gives the person to whom it is made a right to expect or to claim the performance or forbearance of a specified act." (Merriam-Webster.com Dictionary, https://www.merriam.webster.com/dictionary/promise.) They are not synonyms.

14

reasonably presume that they would be "the most significant direct beneficiaries of McDonald's Plan," as they argue.

Third, appellants did not show nonperformance. When appellants filed this lawsuit on May 4, 2023, McDonald's still had over a year and a half to reach the 5 percent goal by the end of 2024. As the trial court aptly observed, "It is unclear how Plaintiffs can make a prima facie showing of Defendant's nonperformance when its deadline period has not even passed." Appellants' own evidence belies nonperformance: AMG's chief revenue officer declared that after it submitted an advertising proposal, McDonald's "agreed to spend $2.1 million with AMG" in 2022.

McDonald's vice-president declared that the company reached its 4 percent goal in 2023, and was on track to meet 5 percent in 2024. AMG's chief revenue officer declared that McDonald's should have spent $15 million in 2022, $20 million in 2023, and concludes, "McDonald's was not spending anywhere near those amounts with AMG." His conclusion is based on the false premise that the Plan only proposed increased allocations "with AMG." He did not claim any knowledge of McDonald's spending with Black-owned production houses and content creators. He asserted a belief that advertising money is not spent on those groups; however, the Plan, which appellants are suing on, and allegedly relied on, states that "advertising dollars" are going to all three groups. Though AMG's officer "know[s]" other Black-owned media companies, he did not profess personal knowledge of McDonald's contracts or spending with competitors, making his claims speculative and based on hearsay.

15

Appellants have not demonstrated required elements of a promissory fraud claim. As a result, they have not shown a probability of prevailing on their false promise claim.

**Attorney Fees**

Appellants separately appealed the trial court's award of statutory attorney fees to McDonald's (B339981). We consolidated the two appeals. Appellants' brief does not address the amount of attorney fees awarded by the trial court; therefore, any challenge to it is forfeited. McDonald's is entitled to recover attorney fees and costs it incurred in this appeal. (§ 425.16, subd. (c)(1); *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499–1500.) The trial court shall determine the amount of the award. (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 489.)

16

**DISPOSITION**

The order striking appellants' complaint is affirmed. Respondent is entitled to recover its attorney fees and costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


RICHARDSON, J.

17